## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHEN WALDEN and LESLIE
WALDEN, individually and on behalf of all
others similarly situated,

      Plaintiffs,

 v.

THE BANK OF NEW YORK MELLON
CORPORATION and BNY MELLON, N.A.,

      Defendants.

Case No. _____20-1972_____

Complaint - Class Action
Jury Trial Demanded

## COMPLAINT - CLASS ACTION

Plaintiffs, individually and on behalf of all others similarly situated (the "Class," as more fully defined below), bring this class action against The Bank of New York Mellon Corporation ("BNY Corp.") and its wholly-owned subsidiary, BNY Mellon, NA, ("BNY Mellon" or the "Bank") (BNY Corp. and BNY Mellon are collectively referred to herein as "Defendants"), arising out of BNY Mellon's multiple breaches of fiduciary duties owed to Plaintiffs and similarly-situated Bank customers, BNY Corp.'s aiding and abetting of the Bank's breaches, and both Defendants' breach of contract and deceptive trade practices.

## NATURE OF THE ACTION

1.    Plaintiffs and the other Class members are current and former customers of BNY Mellon's wealth management division, each of whom transferred funds to BNY Mellon and entrusted the Bank to invest those funds at the Bank's prudent discretion. Plaintiffs and the other Class members collectively deposited millions of dollars with BNY Mellon and vested BNY Mellon with full investment authority with respect to those funds.

2.     BNY Mellon was supposed to invest Plaintiffs' and the other Class members' funds in compliance with its investment management agreement and under a fiduciary standard.

3.     Specifically, BNY Mellon and BNY Corp. promised in their client agreements that BNY Mellon would act as a fiduciary with respect to the wealth management services that it offered to Plaintiffs and the other Class members.

4.     Defendants also represented on their website that, "Under the fiduciary standard, financial advisors have a legal obligation to put the best interests of the client ahead of their own when making investment recommendations." Defendants represented that the fiduciary standard "means choosing the investments that best align with the client's objectives, and sharing all critical information with the client." And Defendants promise that the Bank's wealth management advisors do not have a financial incentive to make investment decisions, representing that "Advisors under the fiduciary standard do not profit based on the investments that are recommended for a client's portfolio."[1]

5.     Defendants each breached their promises to Plaintiffs and the other Class members. BNY Mellon does *not*: (a) act in conformance with its fiduciary duties; (b) put its clients' interests ahead of its own; (c) choose investments that best align with the clients' objectives; or (d) prudently invest its clients' funds.

---

[1] *See* WORK WITH A FIDUCIARY TO ENSURE YOU'RE GETTING THE BEST ADVICE by BNY Mellon and BNY Corp. *available at* https://www.bnymellonwealth.com/articles/strategy/work-with-a-fiduciary-to-ensure-youre-getting-the-best-advice.jsp#:~:text=Under%20the%20fiduciary%20standard%2C%20financial,critical%20information%20with%20the%20client (last visited December 2, 2020).

The BNY Wealth Management website at https://www.bnymellonwealth.com/ appears to be a website maintained by both Defendants. The BNY Corp's wealth management division is housed in its bank subsidiary, BNY Mellon (*see infra,* ¶ 31), and BNY Corp. has "copyrighted" the BNY Wealth Management website. For purposes of this Complaint, all statements on the BNY Wealth Management website are alleged to have been made by both Defendants.

6.      Instead, BNY Mellon, without proper authorization, used client assets to purchase underperforming investment vehicles: (a) in which BNY Mellon and its parent company, BNY Corp., had financial interests; (b) from which BNY Mellon and its individual investment managers[2] received unauthorized and undisclosed commissions, fees, incentive payments, or other compensation; (c) from which BNY Corp. and its affiliates earned millions of dollars in undisclosed fees and other compensation; and (d) that consistently underperformed the market.

7.      These self-dealing, conflicted transactions were not in BNY Mellon's clients' best interests. BNY Mellon, however, placed its clients in these unauthorized, self-dealing investment vehicles even when other, more affordable, and better performing alternative investments were available for its clients.

8.      In other words, instead of offering unbiased services pursuant to a fiduciary standard, BNY Mellon abandoned its fiduciary duties and, instead, advanced its own financial interests over those of its clients, improperly used client assets to purchase preselected, affiliated, and conflicted mutual funds and other investment vehicles that BNY Corp. or its affiliates managed, issued, or sponsored, or to which it was otherwise financially related. BNY Mellon selected these funds not because they were based on independent assessments of its clients' best interests, but rather to enrich itself and its affiliates.

9.      Defendants' self-dealing conduct harmed Plaintiffs and the other Class members, both because the affiliated funds consistently underperformed the market, and because Defendants collected advisory and other fees from Plaintiffs and the other Class members, while BNY Mellon was acting as an unfaithful fiduciary and in violation of its and BNY Corp.'s contracts with them.

---

[2] At BNY Mellon, these investment managers are generally called "wealth managers," and those terms are used interchangeably in this Complaint.

10. In sum, while purporting to act as a fiduciary with respect to its clients' accounts, BNY Mellon, instead, placed its clients' assets in conflicted transactions, without proper authorization, and from which it derived improper and undisclosed payments, and enriched its affiliates to the detriment of Plaintiffs and the other Class members.

11. This action seeks to recover the hundreds of millions of dollars in advisory and investment management fees that Plaintiffs and the other Class members paid to BNY Mellon while it acted as an unfaithful fiduciary, including those portions that BNY Mellon passed on to and thereby enriched BNY Corp., as well as all other damages authorized by law.

## FACTUAL OVERVIEW

12. Plaintiffs Stephen Walden and Leslie Walden and the other Class members are all persons or entities who hired BNY Mellon to provide discretionary investment management services under a fiduciary duty standard.

13. Discretionary investment management is a form of investment management in which the client gives all decision-making authority over his or her assets to an investment manager. As part of the discretionary management relationship, the client turns over a portion of his or her assets to a wealth manager, and trusts that manager to make all buy and sell or other investment decisions and executions for the client's account.

14. The term "discretionary" refers to the fact that investment decisions and execution are made at the wealth manager's sole discretion, rather than at the client's discretion. The wealth manager, not the client, makes buy, sell, and hold decisions, choosing which investments to make and exercising any trades, purchases, or sales.

15. The wealth manager's discretionary authority to invest client funds means that the investment manager, rather than the client, is making all investment decisions on the client's behalf.

4

16.     As part of contracting for these wealth management services with Defendants, Plaintiffs and the other Class members transferred millions of dollars in assets to BNY Mellon and trusted the Bank and its wealth managers to manage and invest those funds at their prudent discretion, in accordance with strict fiduciary duties.

17.     BNY Mellon acknowledged and agreed to its fiduciary duties in its client agreements. In these agreements, BNY Mellon affirmatively represented that the "[Bank] shall be a fiduciary with respect to the discretionary investment management powers." These fiduciary duties included the obligation to act solely in the best interest of the clients and to place clients' interests above the Bank's own interests. BNY Mellon was thus held to the highest standard of care in discharging its advisory duties. Under no circumstance did the fiduciary standard permit BNY Mellon to put its own interests above those of its clients, to engage in self-dealing, or otherwise to enrich itself to the clients' detriment.

18.     Defendants' client agreements with Plaintiffs and each of the other Class members included provisions governing the fees that would apply for the discretionary advisory services. Importantly, the agreements did **not** provide that either BNY Mellon or its individual advisors would receive unauthorized commissions, fees, incentive payments, or other compensation from placing clients in mutual funds or other investment vehicles that the Bank or its affiliates managed, issued, or sponsored. The absence of such a provision made sense, because such a kickback would have created a conflict of interest and violated BNY Mellon's fiduciary duties to its clients. On their website, Defendants specifically represented that individual wealth managers would **not** receive compensation from underlying transactions: "We

are not compensated on the products we sell, but on our expertise and ability to serve our clients well."[3]

19.     Further, Defendants' client agreements with Plaintiffs and each of the other Class members did not disclose conflicts of interest. Specifically, the client agreements did not disclose that BNY Mellon was financially motivated to pick funds managed, issued, or sponsored by BNY Corp. or other affiliates, even if those funds underperformed other available funds that did not enrich its affiliates with fee payments or generated unauthorized compensation for the Bank.

20.     BNY Mellon's purchase of funds managed, issued, or sponsored by BNY Corp. or other affiliates also breached the express terms of its client agreements, including in the following ways:

a.  First, Defendants promised its clients that BNY Mellon would not use its discretionary authority to purchase securities issued by BNY Corp. or its affiliates *at all*. In other words, affiliated securities—that is, securities issued by the Bank or its affiliates—were excepted from the classes of securities BNY Mellon may exercise its discretionary authority to purchase on behalf of its clients. This limitation made sense, because—as it turns out, and as this Complaint alleges— BNY Mellon had a conflict of interest with respect to affiliated funds.

b.  Second, for investment retirement accounts ("IRA"), notwithstanding its promise not to purchase any affiliated securities whatsoever, Defendants specified a list of affiliated funds that BNY Mellon was purportedly authorized to purchase. In these accounts, however, BNY Mellon purchased affiliated funds that were *not* on the pre-authorization list, further enriching its affiliates at its clients' expense. The

---

[3] All statements on the BNY Wealth Management website, www.bnymellonwealth.com, are alleged to be made by both Defendants. *See supra* n.1.

6

purchase of funds not on the list was a further breach of Defendants' contractual duties, as well as contrary to BNY Mellon's fiduciary obligations.[4]

c. Third, Defendants promise that BNY Mellon would make individualized assessments of client needs and trade client funds based on those individualized assessments. Instead of making individualized assessments, however, the Bank used a predetermined program for its clients that preferred underperforming, conflicted, affiliated funds that charged excess fees and underperformed other, non-conflicted investment options. BNY Mellon's predetermined program—and investment decisions made in conformance with that program—were based on the financial benefit Defendants derived from the investments into which BNY Mellon placed client assets, and not on which investments were most suited to or best for individual clients.

d. Fourth, Defendants promised that BNY Mellon would manage client funds according to a fee schedule in its contractual agreements. Defendants breached these agreements by causing BNY Mellon and BNY Corp. and its affiliates to make more money than authorized by these agreements and by causing their clients to be charged fees other than those promised in the client agreements.

e. Fifth, Defendants promised that BNY Mellon would manage client funds according to a fiduciary standard. Defendants breached this promise by, instead, permitting BNY Mellon to engage in the self-dealing transactions detailed in this Complaint and that will be shown at trial.

---

[4] In those limited accounts where BNY Mellon purported to obtain pre-authorization to purchase affiliated funds, it still did not eliminate, mitigate, or provide full and fair discussion of all conflicts of interests, and thus the purchase of *any* affiliated funds in these accounts constituted a breach of fiduciary duty.

21.     Each of these breaches of contract by BNY Mellon also constituted a breach of fiduciary duty because each was a self-dealing transaction rather than a decision made in the best interest of the clients, including Plaintiffs and the other Class members.

22.     Thus, rather than act in accordance with its fiduciary discretionary authority and the client agreements, BNY Mellon abandoned its fiduciary duties, engaged in unlawful self-dealing, and advanced its own financial interests at its clients' expense.

23.     BNY Corp. aided and abetted these breaches, by: (1) causing or permitting to be paid unauthorized commissions or other compensation from BNY Corp. and/or its subsidiaries and affiliates to BNY Mellon and the wealth managers employed by BNY Mellon; (2) encouraging the purchase of affiliated funds that enriched BNY Corp. to the detriment of BNY Mellon's clients; and (3) collecting fees and other compensation from BNY Mellon's clients related to the purchase of affiliated funds and the provision of services related to the affiliated funds, even where the purchase of those funds was not in BNY Mellon's clients' best interests.

24.     Upon information and belief, BNY Mellon and BNY Corp. received hundreds of millions of dollars in advisory fees, management fees, and undisclosed unauthorized compensation during the time they were unfaithful fiduciaries to Plaintiffs and the other Class members.

## PARTIES

### *Plaintiffs*

25.     Stephen and Leslie Walden ("Plaintiffs" or the "Waldens") are husband and wife and are residents of Georgia.

26.     In 2014, Plaintiffs signed client agreements with BNY Mellon and BNY Corp. pursuant to which they entrusted the Bank to invest assets at the Bank's prudent discretion.  The

Waldens transferred over assets to BNY Mellon, which was required to invest those assets pursuant to a fiduciary standard.

27.     BNY Mellon did not, however, act as a faithful fiduciary. Instead, the Bank used its discretionary authority to purchase dozens of mutual funds or other funds managed, issued, or sponsored by affiliates of the Bank and its parent company, BNY Corp.

28.     These affiliated funds included numerous funds that used confusing names that concealed the association between the Bank and those funds. For example, BNY Mellon used its discretionary authority to purchase a number of "Dreyfus" funds, such as the "Dreyfus Select Mger S/C GR-Y" fund, the "Dreyfus Research Growth FD-Y" fund, the "Dreyfus Strategic Value F-Y" fund, the Dreyfus US Equity Fund-Y" fund, and several others.

29.     At no time were the Plaintiffs told or informed that BNY Mellon had a conflict of interest with respect to the affiliated funds the Bank purchased, nor did the Bank explain to Plaintiffs that the Bank had a financial incentive to purchase these funds because of the fees, commissions, and other compensation these purchases generated for the Bank and its affiliates.

### Defendants

30.     BNY Corp. is a Delaware corporation with headquarters at 240 Greenwich Street, New York, New York 10286. According to BNY Corp.'s Form 10-K for the year ended December 31, 2019, BNY Corp. is "a global company headquartered in New York, New York, with $37.1 trillion in assets under custody and/or administration and $1.9 trillion in assets under management as of Dec. 31, 2019."

31.     BNY Corp. is the parent of BNY Mellon. BNY Mellon is a nationally chartered bank which, upon information and belief, houses the wealth management business for BNY Corp. BNY Mellon, N.A. is headquartered at 1 Mellon Center, 500 Grant Street, 47th Floor, Pittsburgh, Pennsylvania 15219.

32. By housing its wealth management business within a nationally chartered bank, Defendants are able to exclude their investment advisory activities from the definition of an Investment Advisor under the Investment Advisers Act of 1940; consequently, Defendants largely escape examination by the United States Securities and Exchange Commission, even though they provide investment advisory services to their clients under the same standards as Investment Advisors who are governed by the Act.

33. BNY Corp. is one of the largest wealth managers in the United States. BNY Corp.'s wealth management division has $2.0 trillion in assets under management as of September 30, 2020, and is America's seventh largest private wealth manager.

34. Plaintiffs' agreement with Defendants opaquely defined the terms "BNY Mellon" and "Bank" to mean "The Bank of New York Mellon Corporation and all subsidiaries, affiliates, and successors," while it simultaneously denied that BNY Corp. was a party to or a provider of services under the agreement. The agreement further provided that the terms "Manager" and "Custodian" meant "the subsidiary of the Bank of New York Mellon Corporation providing services under this Agreement." The agreement identified Defendant BNY Mellon as the wealth management subsidiary that executed the agreement and is also "accepted by" a "subsidiary" of Defendant BNY Corp. Discovery will determine the exact relationship between the Defendants and their respective roles for the misconduct alleged in this Complaint.

## JURISDICTION AND VENUE

35. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy exceeds $5,000,000, and this is a class action in which members of the Class are citizens of states other than Defendants' states of citizenship.

36.     This Court has personal jurisdiction over Defendants because each of them conducted business in the Western District of Pennsylvania on a regular and continuous basis during the relevant time period and BNY Mellon is headquartered in this District. Further, the parties' agreement included a contractual choice of law and venue provision, which provided that the parties agreed to submit to the venue of any Pennsylvania state or federal court for all actions or proceedings arising out of or contemplated by the agreement and provided for application of Pennsylvania law. The statements and omissions that form the basis of Plaintiffs' claims pursuant to The Pennsylvania Unfair Trade Practices and Consumer Protection Law are made by and through the Defendants in this District. For these same reasons, venue is proper in this District.

## FACTUAL ALLEGATIONS

### Overview of the Discretionary Investment Relationship

37.     Discretionary investment management is a form of investment management in which a client cedes investment decisions and execution to a portfolio manager, referred to by the Defendants as a "wealth manager."

38.     The term "discretionary" refers to the fact that investment decisions and execution are made at the wealth manager's sole discretion, rather than at the client's discretion or direction. In other words, in a discretionary relationship—like the one at issue in this case—the wealth manager—and not the client—made all buy and sell decisions and executions for the client's account. Plaintiffs and the other Class members, having ceded decision-making authority and execution to BNY Mellon's wealth managers, did not buy or sell anything in the accounts that they opened with BNY Mellon.

39.     By turning decision-making authority over to the wealth manager, the client relies on the manager to exercise the highest level of fiduciary care with respect to the relationship.

40. When performed in accordance with applicable duties, the discretionary investment management relationship is intended to, among other things, free clients from making day-to-day investment decisions, which are, instead, made by a qualified and independent portfolio manager whose sole responsibility is supposed to be maximizing client return and acting in the client's best financial interest, carefully marshalling, protecting, and growing client assets.

41. Discretionary wealth management is also intended to align the portfolio manager's interests with the client's interests, since managers typically charge a percentage of the assets under administration as their management fee. In theory—and where a manager is acting in accordance with his or her fiduciary duties and free from conflicts of interests—if a client's portfolio grows under the portfolio manager's stewardship, the manager is compensated by receiving a higher dollar amount as the management fee.

42. The discretionary wealth management relationship is, therefore, dependent upon trust, transparency, and the faithful exercise of fiduciary duties, including the duty of care and the duty of loyalty. It also is vitally important that the relationship operate free from undisclosed conflicts of interest that create incentives that are contrary to a client's best interests and interfere with a manager's faithful exercise of its fiduciary duties.

**BNY Mellon's Agreements With and Representations to Plaintiffs and the Other Class Members**

43. Plaintiffs and each of the other Class members signed client agreements with Defendants pursuant to which BNY Mellon became each of their discretionary investment managers.

44. After signing a client agreement with Defendants, Plaintiffs, in 2014, transferred several million dollars to BNY Mellon for it to invest in its discretion and pursuant to the client

agreement. Plaintiffs ultimately opened several accounts with BNY Mellon, all of which Defendants were contractually obligated to manage pursuant to a fiduciary standard.

45.     The client agreement consisted of multi-part agreements that included various sections and addendums, including, amongst others, a "BNY Wealth Management Agreement," and an "Investment Management Agreement." Plaintiffs signed two versions of the BNY Wealth Management Agreement, one for IRAs opened with BNY Mellon and the second for non-retirement accounts. The two versions were similarly structured and, except where differences between them or particular sections are relevant to these allegations, the two versions, together with their incorporated sections and addendums, are collectively referred to herein as the "Agreement."

46.     The Agreement was purportedly with "BNY Mellon Wealth Management." The Agreement was "Accepted by . . . BNY Mellon, N.A.," which was represented to be a subsidiary of "The Bank of New York Mellon Corporation." Upon information and belief, BNY Mellon Wealth Management was not a legal entity and the Agreement was with both BNY Mellon, N.A. and BNY Corp. The contractual promises and commitments referenced herein were made directly or indirectly by both Defendants.

47.      The Agreement contained terms governing the relationship between BNY Mellon and its clients, including Plaintiffs and each of the other Class members.

48.     In the Agreement, Defendants specifically acknowledged and agreed that BNY Mellon "shall be a fiduciary with respect to the discretionary investment management powers set out in the [agreements with the clients]." This statement was consistent with Pennsylvania law and federal law, as described in more detail below—which provided that fiduciary duties arose

where a bank took discretionary authority over customer assets and had the authority to make buy and sell and other investment decisions on customers' behalf.

49.     The Investment Management Agreement (which is part of the Agreement) created an agency relationship and provided for how BNY Mellon would exercise its discretion over client accounts. For example, at the beginning of the Investment Management Agreement, it stated that "Client . . . authorizes the affiliate of The Bank of New York Mellon Corporation . . . identified as the Manager in the Agreement to open one or more investment management accounts . . . ." It further provided that "Client appoints Manager to act as Client's agent for the investment and disposition of the securities, money, or other property . . . held from time to time in such Account(s) and managed in accordance with the terms of [the] Investment Management Agreement . . . ." In other words, the Investment Management Agreement assigned and ceded the authority to the Defendants to buy and sell securities, money, and other property in the accounts.

50.     The terms of the Investment Management Agreement then went on to affirmatively describe the scope of BNY Mellon's discretion. Specifically, the Investment Management Agreement made the following commitments:

a.     "Manager will periodically review the Account, purchase, retain and sell securities, monies, financial instruments and other Property, all in accordance with Client's written investment objectives."

b.     "Manager will invest the Property in such stocks, bonds, notes, mutual funds, collective or other pooled investment vehicles, or other property as Manager deems appropriate, including, without limitation, investing in or using services relating to mutual funds, brokerage services, lending, banking or investment businesses selected by the Manager."

14

    c. "Manager will **not**, however, exercise such discretion to purchase, review or vote any securities issued by BNY Mellon, its subsidiaries or affiliates ('BNY Mellon Securities') and Client acknowledges that Manager cannot and will not make any recommendations with respect to BNY Mellon Securities."[5] (emphasis added).

51.    As alleged herein, Defendants breached each of the above commitments to Plaintiffs and the other Class members due to the Bank's improper and unauthorized practice of using client funds to purchase affiliated "BNY Mellon Securities"; the Bank's purchase of "BNY Mellon Securities" while operating under an undisclosed conflict of interest; and the Bank's use of a predetermined program that preferred underperforming, conflicted, affiliated funds that charged excess fees and underperformed other, non-conflicted investment options, rather than making individualized and prudent investment decisions on its clients' behalf.

52.    The Agreement also spelled out how BNY Mellon was supposed to be compensated for exercising its discretionary advisory services.

53.    Section II, D.1 of the Investment Management Agreement provided that the Bank's compensation for its services rendered under the Agreement "will be in accordance with its schedule of fees in effect at the time the services are rendered and as may be amended from time to time."

54.    In turn, the Fee Schedule in Section I.F. of the Wealth Management Agreement (which was also part of the Agreement) provided for the payment of an Advisory Fee. The Advisory Fee was not transaction based; rather, it was a flat fee that was determined by the

---

[5] Note that the Agreement did not prohibit placing client funds in BNY Mellon Securities where investment in those securities was otherwise permissible and free from conflicts of interest; rather, it prohibited placing clients in such securities *at the Manager's sole discretion*. As noted elsewhere, this limitation made good sense, because, as it turns out, Defendants had multiple conflicts of interest with respect to BNY Mellon Securities.

amount of assets that a client entrusted to the Bank. The Bank did not have to engage in any purchase or sale transactions to earn the Advisory Fee.

55.     The Bank's Advisory Fee decreased if a client entrusted more assets to the Bank. For example, in the Plaintiffs' IRA accounts, the Bank provided that it would charge a 1.25% annual fee on the first $3 million transferred and entrusted to the Bank, and then charge descending flat percentages until a client had transferred $25 million in assets to the Bank, after which the Bank would charge a .35% annual fee on the balance. The Bank charged a "minimum Advisory Fee" of $15,000 per year.

56.     These fees were represented to include payment for such services as "a dedicated Portfolio Manager responsible for portfolio transition, personalized planning and day-to-day account administration; account-level asset allocation analysis and wealth management program; customization of portfolios and corresponding asset allocation; portfolio monitoring and rebalancing; income and principal allocations, if appropriate; portfolio services; and securities safekeeping."

57.     The Agreement thus permitted BNY Mellon to charge an Advisory Fee (as well as a few other fees) set forth in the Agreement. Defendants, however, breached these covenants by receiving unauthorized compensation not authorized by these provisions, and by permitting their affiliates to earn fees other than those promised in or permitted by the fee schedule.

58.     Similarly, BNY Mellon breached its fiduciary duties to Plaintiffs and the other Class members by not explaining that affiliate fees and the unauthorized compensation provided a conflicted incentive for BNY Mellon to prefer purchasing affiliated funds that paid those fees and unauthorized compensation, rather than preferring better performing, non-affiliated funds.

59. The Investment Management Agreement also had a provision entitled "Affiliated Funds Authorization/Disclosure." This section purported to make additional disclosures with respect to investments in "vehicles advised by Manager or an affiliate." The Affiliated Funds Authorization/Disclosure section went on to make certain disclosures concerning additional fees that BNY Mellon could make "if Manager or any of its affiliates is the advisor for any vehicle in which Client's assets are invested, or performs any other services for the vehicle . . . ." Under such circumstances, the Agreement provided that "a) Manager may receive its regular and usual management or services fees from the vehicle" and "d) a portion of the vehicle's fund management fee is credited or rebated to BNY Mellon's Wealth Management business group for internal bookkeeping purposes when Manager invests Client's assets in the vehicle."

60. Similarly, the version of the Agreement for the IRA accounts contained an "Affiliated Mutual Funds Disclosure and Authorization" Addendum (the "Addendum"). The Addendum lists several Affiliated Mutual Funds that the client purports to authorize and approve BNY Mellon to purchase. It also stated that "a portion of the Affiliated Mutual Fund's investment advisory fee is credited to BNY Mellon Wealth Management for internal bookkeeping purposes when BNY Mellon managed accounts . . . are invested in that Affiliated Mutual Fund," and listed a number of other fees that BNY Corp. affiliates might receive.

61. Defendants will likely contend that these provisions provided disclosure of the unauthorized compensation and other payments challenged in this Complaint, as well as the self-dealing fees paid to the affiliates. But, for a number of reasons, these provisions are inapplicable to the wrongdoing alleged in this Complaint and are wholly inadequate as a fulsome explanation of Defendants' conflicts of interest that interfered with their faithful exercise of their fiduciary duties to Plaintiffs and the other Class members.

17

62.   First, by its terms, these provisions are only triggered if BNY Mellon used client assets to purchase affiliated funds. Although BNY Mellon disclosed in this provision that it would "typically invest in vehicles advised by Manager or an affiliate," it also represented that it would not invest in BNY Mellon Securities *at its sole discretion*. Thus, Defendants cannot take advantage of any disclosures in this section if it purchased affiliated funds at its sole discretion in violation of its representation that it would not do so.

63.   Second, the referenced provisions only permitted BNY Mellon to make "*its* regular and usual management or services fees from the vehicle." BNY Mellon, however, was not authorized to receive any "regular and usual management or services fee" from any affiliated fund, because such fees (a) were not authorized by the prospectuses or other documents governing the affiliated funds; and (b) represented unauthorized and conflicted payments that contradicted and undermined BNY Mellon's fiduciary duties and both Defendants' contractual duties to its clients.

64.   Third, the provision that a "portion of the vehicle's fund management fee is credited or rebated to BNY Mellon's Wealth Management business group for internal bookkeeping purposes" was inadequate in several respects, assuming Defendants argue that this provision referenced the unauthorized commissions or other compensation at all. This provision failed to explain the purpose or justification for any credit or rebate; did not disclose the conflict of interest such a credit or rebate created; did not clearly define the entity or group to which such credits or rebates flowed (referring opaquely to BNY Mellon's Wealth Management business group—whatever that may be); and downplayed the significance of any payments made pursuant to that provision by calling them "credits" and "rebates" for "bookkeeping purposes," rather than incentive payments or other unauthorized compensation that create conflicts and incentives

contrary to a client's best interest. Indeed, that a reader of this provision could not tell which fees were covered by this provision demonstrates the inadequacy of the provision as a disclosure of a conflict of interest.

65. Fourth, and most importantly, none of these addenda explained that the payment of fees to affiliates, and the payments of unauthorized compensation, would create conflicts of interest that would give the Bank an incentive to purchase affiliated funds even when those funds were not in the Bank clients' best interests. To have complied with its fiduciary duties, this conflict must either have been eliminated (by the purchase of non-conflicting funds) or must have been mitigated by informed consent following full explanation of the conflict. Here, the Bank made no explanation whatsoever of its motivation to purchase these conflicted funds.

66. In summary, these purported disclosure statements did not apply here because they did not expressly authorize BNY Mellon to receive unauthorized commissions, fees, or other compensation for using client assets to purchase affiliated funds at its sole discretion. Nor did they adequately explain the conflicts of interest associated with such unauthorized commissions, fees, or other compensation.

67. Thus, nowhere in the Agreement:

    a. was it disclosed that BNY Mellon would receive unauthorized commissions, fees, incentive payments, or other compensation from purchasing affiliated funds;

    b. was there any explanation of the financial conflict of interest that the payment of unauthorized compensation to BNY Mellon and its individual advisors created;

    c. was it explained that unauthorized compensation paid to BNY Mellon and its individual advisors by BNY Corp. or its affiliates would create an incentive for

the Bank or advisors to place clients in affiliated funds, rather than in other funds that may be better suited to the particular needs of an individual client;

d. was it explained that the payment of fees to affiliates—which enrich BNY Corp.—created an incentive for the Bank or its advisors to place clients in affiliated funds even if these funds are not in the clients' best interests; or

e. was it explained that a conflict arises from shifting assets from individual security selection (on which affiliated entities would receive no funds) to affiliated funds (on which affiliated entities would receive management fees).

**The Bank's Fiduciary Duties**

68.     As noted, in its Agreement, BNY Mellon agreed to be a fiduciary with respect to the discretionary authority to manage and invest assets entrusted to the Bank by its clients. The fiduciary duty is the highest duty implied by law.

69.     The fiduciary duty requires a party to act with the utmost good faith in furthering and advancing the other party's interests. The fiduciary duty here required BNY Mellon to disclose all relevant information, including disclosing all fees to its clients. It also created an affirmative duty for BNY Mellon to disclose any potential conflicts of interest.

70.     Federal banking law also imposed a fiduciary duty on BNY Mellon and the individual advisors. Federal banking law provides that a national bank engaged in portfolio advisory and management activities for a fee—like BNY Mellon provides here—is acting in a fiduciary capacity. 12 C.F.R. § 9.101.

71.     These regulations go even further and include a prohibition on a national bank—like BNY Mellon—from investing funds of a fiduciary account for which it has investment discretion in the stock or obligations of, or in assets acquired from, affiliates of the bank or

individual or organizations with whom there exists an interest that might affect the exercise of the best judgment of the bank. 12 C.F.R. § 9.12.

72.     Although federal banking law also permits that specific provisions of a governing instrument may authorize a bank fiduciary to engage in what would otherwise be an impermissible conflict of interest, the agreement must specifically authorize the fiduciary to purchase the otherwise impermissible asset or enter into the otherwise impermissible type of transaction, and any conflicts of interest in the transaction must be fully and adequately disclosed. That did not occur here.

73.     Further, federal bank regulators, including the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve, have repeatedly made clear that a national bank operating in a fiduciary capacity must have clear internal policies and procedures regarding investments, and must engage in analysis and assessment of the appropriateness of investments for individual accounts and whether those investments are in clients' best interests. That did not occur here.

74.     The fiduciary duty owed by the Bank to Plaintiffs and the other Class members here required it to adopt their goals, objectives, or ends. That meant that the adviser must have, at all times, served its client's best interests and not subordinate those interests to its own. In other words, the investment adviser may not place its own interests ahead of its client's interests. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in its client's "best interest" at all times.

75.     The duty of care requires an investment adviser to provide investment advice in its client's best interests, based on the client's objective.

76.     Under its duty of loyalty, an investment adviser must eliminate, or at least expose, all conflicts of interest which might incline an investment adviser—consciously or otherwise—to render advice which is not disinterested, such that a client can provide informed consent to the conflict.

77.     With respect to conflicts of interest, a full and fair explanation concerning the presence of a conflict—coupled with informed consent—must be provided to the client. The explanation of the conflict must be sufficient so that the client is able to understand the conflict and make an informed decision whether to provide consent.

78.     Under no circumstance may an investment adviser obfuscate actual conflicts to the point where the client cannot provide informed consent, nor fail to entirely identify an actual or potential conflict. Any description of a conflict must be clear and detailed enough for the client to make an informed decision to consent to the conflict of interest or reject it.

79.     Thus, as a fiduciary, BNY Mellon has an obligation to put its clients' best interests ahead of its own when making investment recommendations. The Bank was prohibited by federal law from investing client funds in affiliated securities unless it had clear and unequivocal contractual authority to do so, and then only with full explanation of conflicts of interest in the transaction.

80.     The fiduciary standard also meant choosing the investments that best aligned with the client's objectives and which were free from conflicts of interest. Should any potential conflicts arise at any point, the fiduciary standard required the Bank to inform the client and resolve those conflicts in the client's favor. And Defendants were required to be honest and transparent with their fee structure. The Bank was required to exercise independent judgment in making investments, making only those investments that are appropriate and in its client's best

interest. And, finally, BNY Mellon was required to operate free from any undisclosed conflicts of interest.

**BNY Mellon Breached its Fiduciary Duties**

81.    BNY Mellon used its discretionary authority to purchase affiliated funds without Plaintiffs' informed consent regarding: (a) the purchase of the funds; and (b) the unauthorized incentive fees it was receiving, and the conflicts of interest arising from those fees.

82.    For example, in the discretionary accounts that Defendants managed for Plaintiffs, Defendants purchased at least the following affiliated funds:

    a.   Dreyfus Diversified EM MK-Y

    b.   Dreyfus Diversified Intl-I

    c.   Dreyfus EMG MKT Debt LOC C-Y

    d.   Dreyfus Floating Rate Inc-Y

    e.   Dreyfus Global Real ES Sec-Y

    f.   Dreyfus High Yield-I

    g.   Dreyfus International Stock-Y

    h.   Dreyfus Infl TN Adj SEC-Y

    i.   Dreyfus L/C Equity Fund-IN

    j.   Dreyfus/Newton Intern Eqty-Y

    k.   Dreyfus Research Growth FD-Y Fund

    l.   Dreyfus Select Mger S/C GR-Y Fund

    m.   Dreyfus Select Mger S/C VL-Y Fund

    n.   Dreyfus Strategic Value F-Y Fund

    o.   Dreyfus US Equity Fund-Y

p.  BNY Mellon Bond Fund-M

q.  BNY Mellon Corp Bond-M

r.  BNY Mellon Emerging Mkts-M

s.  BNY Mellon Income Stock-M

t.  BNY Mellon Intermediate BD-M

u.  BNY Mellon International-M Fund

v.  BNY Mellon Intl Equity Income Fund

w.  BNY Mellon M/C Multi-Strategy Fund

x.  BNY Mellon Muni Opport-M

y.  BNY Mellon Natl INTM Muni-M

z.  BNY Mellon NAT S/T Muni BD-M

aa. BNY Mellon S/T US Gov SECS-M

83.     Each of the above-listed Funds was a fund managed by an affiliate of Defendants. Thus, upon information and belief, BNY Corp. and/or its affiliates received portions of the management fees paid by Plaintiffs with respect to these Funds. These management fees were in addition to the Advisory Fee paid pursuant to the contractual Agreements. And, on information and belief, BNY Mellon received an undisclosed and unauthorized commission/incentive payment for purchasing these affiliated Funds.

84.     BNY Mellon did not seek or obtain Plaintiffs' (or the other Class members') approval before investing in each of the above affiliated Funds. To the contrary, at least in the non-retirement accounts, BNY Mellon specifically promised that it would *not* use its sole discretion to purchase affiliated Funds. And as to the IRA accounts, some of these funds do not appear on the list of "affiliated" funds listed on the Agreements' addendum.

85.     BNY Mellon did not adequately explain to Plaintiffs or, based on the uniform language across the Agreements, to the other Class members, that Defendants' affiliates make money from managing these Funds, and, in particular, failed to explain that those affiliates earn fees from managing those Funds other than the fees disclosed in the Agreements' fee schedule.

86.     BNY Mellon did not explain to Plaintiffs (or to the other Class members) that it would receive compensation each time it purchased any of these affiliated Funds.

87.     BNY Mellon did not explain to Plaintiffs (or to the other Class members) that its receipt of compensation each time it purchased any of these affiliated Funds created a conflict of interest for BNY Mellon that might cause the Bank to prefer, to the detriment of Plaintiffs (and the other Class members), the affiliated Funds over other investment options.

88.     BNY Mellon did not explain to Plaintiffs (or to the other Class members) that its compensation scheme would reward individual advisors for cross-selling conflicted, affiliated accounts.

89.     BNY Mellon did not explain to Plaintiffs (or to the other Class members) that its practice of rewarding individual advisors for cross-selling conflicted, affiliated accounts might cause individual advisors to prefer the affiliated funds over other investment options.

90.     BNY Mellon did not explain to Plaintiffs (or to the other Class members) that it would apply a rote and non-individualized investment protocol to their accounts that preferred affiliated Funds over individual security positions or other, non-affiliated Funds that would have been less expensive to Plaintiffs (or to the other Class members). Such investments comprised as much as 95 percent of Plaintiffs' portfolio in certain of their accounts.

91.     BNY Mellon failed to explain to Plaintiffs (or to the other Class members) that, contrary to their interests, it was preferring affiliated funds that had a history of underperforming market benchmarks as well as other non-affiliated, less expensive, and non-conflicted funds.

92.     Thus, in summary, while purporting to act as a fiduciary with respect to its clients' accounts, the Bank instead placed their clients' assets in conflicted transactions, without proper authorization, and from which it derived improper and undisclosed payments and enriched its affiliates to the detriment of Plaintiffs and the other Class members.

**BNY's Deceptive Conduct Tolls any Applicable Statute of Limitations**

93.     Throughout the time period relevant to this action, Defendants failed to disclose to Plaintiffs and the other Class members the conflicts of interest and breaches described herein.

94.     Defendants kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims, including, for example and specifically, the fact of unauthorized compensation paid to BNY Mellon and its wealth managers. As a result, neither Plaintiffs nor the other Class members could have discovered that fact, even upon the exercise of reasonable diligence.

95.     Defendants, further, used deceptive practices to obfuscate the affiliation between BNY Mellon and BNY Corp. and affiliated securities purchased by BNY Mellon in the unfaithful exercise of its discretion. Specifically, Defendants used confusing names that concealed the association between the Defendants and affiliated funds and fund advisors. For example, Defendants used Plaintiffs' assets to purchase a number of "Dreyfus" funds, such as the "Dreyfus Select Mger S/C GR-Y" fund, the "Dreyfus Research Growth FD-Y" fund, the "Dreyfus Strategic Value F-Y" fund, the Dreyfus US Equity Fund-Y" fund, and several others.

The Dreyfus funds are affiliated with the Defendants, but that affiliation is not apparent from the name of the fund or the name of the advisor.

96.     Despite their knowledge of the unauthorized commission, undisclosed conflicts of interest, and deceptive practices, Defendants failed to disclose, and continue not to disclose, critical information from Plaintiffs and the other Class members including, for example, the unauthorized compensation and the conflicts of interest created by purchasing affiliated funds.

97.     Plaintiffs and the other Class members justifiably relied on Defendants, and especially their fiduciary, BNY Mellon, to disclose to them all conflicts of interests and other information required to be disclosed. Because Defendants failed to make these disclosures, the critical facts related to this action were not discoverable through reasonable efforts by Plaintiffs and the other Class members.

98.     Defendants employed a uniform, deceptive practice whereby they concealed the affiliated nature of the funds referenced in this Complaint.

99.     More specifically, when class members would inquire about performance of affiliated funds, based upon information and belief as well as the experiences of Plaintiffs, Defendants would conceal their wrongful activity. BNY Mellon uniformly explained its selection of affiliated funds by describing those funds as providing "greater diversity of holdings"; "consistency as compared to individually managed separate account portfolios"; and "more cost effective investment vehicles . . . than unaffiliated mutual funds with similar investment objectives."

100.     These uniform, explanatory statements concealed the conflicts of interest inherent in these affiliated-fund purchases, including the unauthorized and undisclosed commission payments and the fees paid to BNY Mellon affiliates. These uniform, explanatory statements

also concealed that unaffiliated funds with lower cost structures and better performance records would have been more appropriate for their portfolios. These uniform, explanatory statements were designed to dissuade Plaintiffs and the other Class members from initiating legal action or conducting additional investigation because they inaccurately and misleadingly represented that BNY Mellon was acting in the best interests of Plaintiffs and the other Class members when, in fact, it was, at the time of that communication, violating its fiduciary and contractual duties to each of them.

101.    Defendants' uniform practice of concealment is evidenced by Plaintiffs' experience. After experiencing lower-than-expected performance in their accounts, Plaintiffs expressed concern to their BNY Mellon wealth managers about the Bank's practice of placing their portfolio in BNY Mellon-affiliated funds and asked whether that placement was appropriate.

102.    Rather than truthfully responding to Plaintiffs' inquiry—including by disclosing and discussing the conflicts of interest created by the practice of purchasing affiliated funds—BNY Mellon again gave Plaintiffs the same, uniform and misleading, explanation they provide to all Class members concerning the practice of purchasing affiliated funds; specifically, BNY Mellon told Plaintiffs the purchase of affiliated funds creates "transparency, customization and cost efficiency versus non-affiliated mutual funds."

103.    For the reasons alleged in this Complaint, this explanation is untruthful, misleading, and incomplete. The practice of purchasing affiliated funds is not "transparent" or "cost-efficient," because the practice enriches BNY Mellon, BNY Corp., and their affiliates through undisclosed and unauthorized commissions, fees, incentive payments, or other compensation. The practice also involves undisclosed conflicts of interest that violate the Bank's

28

fiduciary duties and both Defendants' contractual duties. On information and belief, this same untruthful, misleading, and incomplete explanation was given to any Class member that requests further information concerning the practice of purchasing affiliated funds.

104.    Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims by Plaintiffs and the other Class members, by virtue of the discovery rule, fraudulent concealment doctrine, and equitable tolling.

**CLASS ACTION STATEMENT**

105.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

106.    Plaintiffs seek to represent the following class ("the Class"):

> All persons or entities, for whom: (a) BNY Mellon had investment discretion over assets that they provided to the Bank, pursuant to an investment advisory agreement or similar agreement; and (b) BNY Mellon used its discretionary authority to invest in investment vehicles that were financially affiliated with BNY Mellon or BNY Corp.

107.    Excluded from the Class are Defendants BNY Mellon and BNY Corp. and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

108.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

109.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. BNY Mellon houses the wealth management business for BNY Corp., which is

America's seventh largest private wealth manager. While Plaintiffs are informed and believe that there are thousands of Class members, the precise number of Class members is presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

110.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.      whether Defendants engaged in the conduct alleged herein;

b.      whether Defendants' alleged conduct violates applicable law;

c.      whether BNY Mellon failed to act solely for the benefit of Plaintiffs and the other Class members, acting instead in its own benefit and to the benefit of BNY Corp. and their affiliates;

d.      whether BNY Mellon owed a duty of care in connection with providing discretionary advisory services to Plaintiffs and the other Class members and breached that duty;

e.      whether BNY Mellon owed fiduciary duties in connection with providing discretionary advisory services to Plaintiffs and the other Class members and breached those duties;

f.      whether BNY Corp. aided and abetted BNY Mellon's breach of fiduciary duties in connection with providing discretionary advisory services to Plaintiffs and the other Class members;

g.      whether BNY Corp.'s and BNY Mellon's conduct caused Plaintiffs and the other Class members to suffer a compensable loss;

h.      whether BNY Corp.'s and BNY Mellon's conduct alleged herein violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

i.      whether Plaintiffs and the other Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

j.      the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

111.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and each of the other Class members were wealth management clients of BNY Corp. and BNY Mellon, who deposited funds with BNY Mellon and vested it with full investment authority with respect to those funds, which were thereafter placed into conflicted transactions, without proper authorization, that enriched Defendants and their affiliates. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

112.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to

prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

113.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

114.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CLAIMS ALLEGED**

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendant BNY Mellon)**

115.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-114, above, as if fully set forth herein.

116. BNY Mellon was a fiduciary of Plaintiffs and each of the other Class members.

117. BNY Mellon breached its fiduciary duties to Plaintiffs and each of the other Class members.

118. BNY Mellon failed to act in good faith and solely for the benefit of the Plaintiffs and the other Class members in all matters for which BNY Mellon was employed, acting instead in its own benefit and to the benefit of its affiliates.

119. BNY Mellon acted at least negligently with respect to its fiduciary duty breaches.

120. Plaintiffs and each of the other Class members sustained financial injuries as a result of BNY Mellon's fiduciary duty breaches.

121. BNY Mellon's failure to act solely for the benefit of Plaintiffs and each of the other Class members was a real factor and was the cause in fact of bringing about Plaintiffs' and the other Class members' injuries.

122. Plaintiffs and each of the other Class members suffered actual losses as a consequence of BNY Mellon's fiduciary duty breaches and have been damaged in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE
### (Against Defendant BNY Mellon)

123. Plaintiffs repeat and reallege the allegations in Paragraphs 1-114, above, as if fully set forth herein.

124. BNY Mellon owed a duty of care to Plaintiffs and each of the other Class members to provide advisory services according to the standard of care imposed by law.

125. BNY Mellon breached and failed to perform its duties as described herein.

126.     BNY Mellon's failure to perform its duties is the proximate cause of injury to the Plaintiffs and each of the other Class members.

127.     Plaintiffs and each of the other Class members have suffered actual losses as a consequence of BNY Mellon's breach of its duties and have been damaged in an amount to be proven at trial.

**COUNT III**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Defendant BNY Corp.)**

128.     Plaintiffs repeat and reallege the allegations in Paragraphs 1-127, above, as if fully set forth herein.

129.     BNY Corp. rendered substantial assistance to BNY Mellon in accomplishing BNY Mellon's fiduciary duty breaches to Plaintiffs and each of the other Class members, including, without limitation, the following:

    a.  Causing to be paid or permitting to be paid kickbacks or other compensation from BNY Corp. and/or its subsidiaries and affiliates to BNY Mellon and the individual wealth managers who BNY Mellon employed;

    b.  Encouraging the purchase of affiliated funds that enriched BNY Corp. to the detriment of BNY Mellon's clients; and

    c.  Collecting fees and other compensation from BNY Mellon's clients related to the purchase of affiliated funds and the provision of services related to the affiliated funds, even where purchase of those funds was not in BNY Mellon's clients' best interests.

130. In providing the aforementioned substantial assistance to BNY Mellon, BNY Corp. acted with knowledge that BNY Mellon was in breach of its fiduciary duties to Plaintiffs and each of the other Class members.

131. BNY Corp. acted in concert with BNY Mellon and pursuant to a common design—namely to enrich themselves to the detriment of BNY Mellon's clients and in violation of BNY Mellon's contractual and fiduciary duties to Plaintiffs and each of the other Class members.

132. Plaintiffs and each of the other Class members have suffered injury and actual losses as a proximate consequence of BNY Corp's misconduct in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(Against Both Defendants)**

133. Plaintiffs repeat and reallege the allegations in Paragraphs 1-114, above, as if fully set forth herein.

134. The Agreement is a contract between Plaintiffs and each of the other Class members, on the one hand, and Defendants, on the other hand.

135. Defendants have breached the essential terms of the contract. Among the essential terms breached by the Defendants include the following:

    a. First, Defendants promised their clients that they would not use discretionary authority to purchase securities issued by BNY Corp. or its affiliates *at all*. In other words, affiliated securities—that is, securities issued by the Bank or its affiliates—are excepted from the classes of securities BNY Mellon may exercise its discretionary authority to purchase on behalf of its clients.

35

Defendants breached this promise to Plaintiffs and each of the other Class members by permitting BNY Mellon to use discretion to buy affiliated funds.

b. Second, with respect to IRA accounts, notwithstanding its promise not to purchase any affiliated securities whatsoever, Defendants specify a list of affiliated funds that BNY Mellon is purportedly authorized to purchase. In these accounts, however, BNY Mellon purchases affiliated funds that are *not* on the pre-authorization list, further enriching its affiliates at its clients' expense. The purchase of funds not on the list is a further breach of Defendants' contractual duties, as well as contrary to BNY Mellon's fiduciary obligations.

c. Third, Defendants promise that BNY Mellon would make individualized assessments of client needs and trade client funds based on those individualized assessments. Instead of making individualized assessments, however, the Bank used a predetermined program for all of its clients that preferred underperforming, conflicted, affiliated funds that charged excess fees and underperformed other, non-conflicted investment options. BNY Mellon's predetermined program—and investment decisions made in conformance with that program—were based on the financial benefit Defendants derived from the investments into which BNY Mellon placed client assets, and not on which investments were most suited to or best for individual clients.

d. Fourth, Defendants promised Plaintiffs and each of the other Class members that BNY Mellon would manage their funds according to a fee schedule in the

Agreement. Defendants breached the Agreement with Plaintiffs and each of the other Class members by causing BNY Mellon and BNY Corp. and their affiliates to make more money than authorized by the Agreement and by causing their clients to be charged fees other than those promised in the Agreement.

e. Fifth, Defendants promised that BNY Mellon would manage their funds according to a fiduciary standard. Defendants breached this promise to Plaintiffs and each of the other Class members by, instead, engaging in the self-dealing transactions alleged in this Complaint and that will be proven at trial.

136.    Plaintiffs and each of the other Class members have suffered actual injuries and damages as a consequence of Defendants' breaches, in an amount to be proven at trial.

## COUNT V
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 – 201-9.2
### (Against Both Defendants for Their Affirmative Misrepresentations)

137.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-114, above, as if fully set forth herein.

138.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 – 201-9.2 (the "UTPCPL") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id*. at § 201-3. BNY Mellon and BNY Corp. are engaged in "trade" and "commerce" as those terms are defined by the UTPCPL.

139.    BNY Mellon, which is headquartered in Pennsylvania, and BNY Corp., which does business in Pennsylvania both directly and through its subsidiary, BNY Mellon, and which

agreed in the Agreement that Pennsylvania law applies to its relationships with Plaintiffs and the Class members, are each a "person," as that term is defined by 73 P.S. § 201-2(2).

140. Section 201-2(iii) of the UTPCPL prohibits a person from "[c]ausing [the] likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another."

141. Section 201-2(vii) of the UTPCPL prohibits a person from "[r]epresenting that . . . services are of a particular standard, quality or grade . . . ."

142. Section 201-2(xxi) of the UTPCPL is a "catch-all" provision that prohibits a person from "[e]ngaging in any other . . . deceptive conduct which creates a likelihood of confusion or of misunderstanding."

143. As alleged herein, Defendants made affirmative misrepresentations (through the Agreements and their website) to Plaintiffs and each of the Class members that created the likelihood that Plaintiffs and each of the Class members would be confused and misunderstand the nature of the discretionary investment management services that the Bank would provide. In addition to BNY Corp. making these statements directly to Plaintiffs and each of the Class members, it also made these statements indirectly through BNY Mellon, a wholly owned subsidiary that it controlled.

144. Defendants affirmatively misrepresented that BNY Mellon would: (a) act in conformance with its fiduciary duties; (b) put its client's interests ahead of its own; (c) choose investments that best aligned with its clients' objectives; and (d) prudently invest its clients' funds.

145. Further, BNY Mellon specifically represented that the Bank's individual wealth managers will *not* receive compensation from underlying transactions.

38

146.    Defendants' affirmative misstatements were made knowingly and with the intention of creating a likelihood of confusion, or were, at the very least, made negligently.

147.    Plaintiffs and each of the other Class members justifiably relied on Defendants' affirmative deceptive statements and other conduct and practices. Plaintiffs and the other Class members would not have opened discretionary accounts at BNY Mellon and vested the Bank with full investment authority with respect to the funds deposited in those accounts had they not been deceived into believing that BNY Mellon would act in conformance with its fiduciary duties, including by not engaging in self-dealing to the detriment of Plaintiffs' and other Class members' interests.

148.    Plaintiffs and each of the other Class members have been damaged by Defendants' deceptive acts in connection with the Bank's wealth management services. For example, Plaintiffs and the other Class members paid advisory and investment management fees to BNY Mellon while, unbeknownst to them, the Bank was acting as an unfaithful fiduciary. Plaintiffs and the other Class members would, at the very least, not paid the aforementioned fees had Defendants not deceived them with respect to the nature of the Bank's wealth advisory services.

149.    Plaintiffs, individually and on behalf of each of the other Class members, and pursuant to the UTPCPL, have suffered an ascertainable loss and seek to recover either their actual damages or one hundred dollars ($100.00) for each of Defendants' statutory violations, whichever is greater, together with trebling of actual damages, counsel fees, expenses and costs, as well as any and all such other items of damage and equitable relief available.

## COUNT VI
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1 – 201-9.2.
### (Against Both Defendants for Their Deceptive Omissions)

150.    Plaintiffs repeat and reallege the allegations in Paragraphs 1-114 and 138-142, above, as if fully set forth herein.

151.    In connection with agreeing to provide wealth management services to Plaintiffs and the other members of the Class, Defendant BNY Mellon owed fiduciary duties to Plaintiffs and the other Class members. As such, the Bank had a duty to disclose all relevant information concerning its wealth management services to Plaintiffs and the other Class Members.

152.    In addition, BNY Corp., as the parent company of BNY Mellon, also made numerous affirmative statements with the Bank in the Agreements and on their website about the wealth management services. In light of that close relationship, Defendants knew that Plaintiffs and the other members of the Class, in opening discretionary accounts at BNY Mellon and vesting the Bank with full investment authority with respect to the funds deposited in those accounts, relied on Defendants' affirmative statements. As such, each Defendant had a duty to disclose all relevant information concerning the Bank's wealth management services to Plaintiffs and the other Class members.

153.    As alleged herein, however, Defendants deceptively omitted relevant information in their dealings with Plaintiffs and the other Class members, including on their website and in the Agreements, which created the likelihood that Plaintiffs and each of the other Class members would be confused and misunderstand the nature of the discretionary investment management services that the Bank agreed to provide.

154.    Defendants' website and the Agreements that Defendants entered into with Plaintiffs and each of the other Class members deceptively did not disclose, among other things,

that BNY Mellon would not: (a) act in conformance with its fiduciary duties; (b) put its client's interests ahead of its own; (c) choose investments that best aligned with its clients' objectives; and (d) prudently invest its clients' funds.

155.    The Agreements that Defendants entered into with Plaintiffs and each of the other Class members did not disclose BNY Mellon's conflicts of interests as set forth herein. For example, Defendants did not disclose, through the Agreements or otherwise, that either BNY Mellon or its individual advisors may receive unauthorized commissions, fees, incentive payments, or other compensation from placing clients in mutual funds or other investing vehicles that the Bank or its affiliates managed, issued, or sponsored, even if those funds underperform other available funds that do not enrich its affiliates with fee payments or generate unauthorized compensation for the Bank. Such compensation creates a conflict of interest and violates BNY Mellon's fiduciary duties that are owed to its clients.

156.    Defendants' deceptive omissions were done knowingly and with the intention of creating a likelihood of confusion, or were, at the very least, done negligently.

157.    Plaintiffs and each of the other Class members justifiably relied on Defendants' affirmative deceptive statements and other conduct and practices. Plaintiffs and the other Class members would not have opened discretionary accounts at BNY Mellon and vested the Bank with full investment authority with respect to the funds deposited in those accounts had they not been deceived into believing that BNY Mellon would act in conformance with its fiduciary duties, including by not engaging in self-dealing to the detriment of Plaintiffs' and the other Class members' interests.

158.    Plaintiffs and each of the other Class members have been damaged by Defendants' deceptive acts in connection with the Bank's wealth management services. For

example, Plaintiffs and the other Class members paid advisory and investment management fees to BNY Mellon while, unbeknownst to them, the Bank was acting as an unfaithful fiduciary. Plaintiffs and the other Class members would, at the very least, not paid the aforementioned fees had Defendants not deceived them with respect to the nature of the Bank's wealth advisory services.

159.    Plaintiffs, individually and on behalf of each of the other Class members, and pursuant to the UTPCPL, have suffered an ascertainable loss and seek to recover either their actual damages or one hundred dollars ($100.00) for each of Defendants' statutory violations, whichever is greater, together with trebling of actual damages, counsel fees, expenses and costs, as well as any and all such other items of damage and equitable relief available.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members they seek to represent, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

2.    Declaring that Defendants' conduct violated the UTPCPL;

3.    Entering an injunction ordering BNY Mellon to refrain from further breaches of its fiduciary duties;

4.    Entering an injunction ordering Defendants to adopt policies and practices that will assure their full compliance with the UTPCPL;

5.    Ordering Defendants to pay actual and statutory damages (including punitive and treble damages) and restitution to Plaintiffs and the other Class members, as allowable by law;

6.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts

awarded;

7.      Ordering Defendants to pay attorneys' fees and costs of suit; and

8.      Ordering such other and further relief as may be just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 21, 2020

/s/ Robert F. DiCello
Robert F. DiCello (OH0072020)
Justin J. Hawal (OH0092294)
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio 44060
Tel: 440-953-8888
rfdicello@dicellolevitt.com
jhawal@dicellolevitt.com

Adam J. Levitt*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: 312-214-7900
alevitt@dicellolevitt.com

Bruce D. Bernstein*
**DiCELLO LEVITT GUTZLER LLC**
1101 Pennsylvania Ave N.W., Suite 300
Washington, DC 20004
Tel: 202-975-2288
bbernstein@dicellolevitt.com

Stephen D. Councill*
Joshua P. Gunnemann*
**COUNCILL & GUNNEMANN LLC**
1201 Peachtree Street N.E.
Building 400, Suite 100
Atlanta, Georgia 30361
Tel: 404-407-5250
scouncill@cogunn.com
jgunnemann@cogunn.com

*Counsel for Plaintiffs and the Proposed Class*

*\* Pro hac vice applications forthcoming*