IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| STEPHEN WALDEN, LESLIE WALDEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; | ) ) ) ) | 2:20-CV-01972-CRE |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| THE BANK OF NEW YORK MELLON CORPORATION,  BNY MELLON, N.A., | ) ) ) | |
| Defendants, | ) ) | |

## MEMORANDUM AND ORDER[1]

CYNTHIA REED EDDY, United States Magistrate Judge.

### I.    INTRODUCTION

This putative class action was initiated in this Court on December 21, 2020 by Plaintiffs Stephen and Leslie Walden (collectively "the Waldens"), individually and on behalf of those similarly situated, against Defendants Bank of New York Mellon Corporation and BNY Mellon, N.A. (collectively "BNY Mellon").  The Waldens generally assert breach of contract claims and claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 – 201-9.2 ("UTPCPL") in connection with investment management services BNY Mellon provided to the Waldens under investment management agreements.

Presently before the Court is a motion by BNY Mellon to exclude the opinions of the Waldens' expert Dr. Edward S. O'Neal, Ph.D. under Federal Rule of Evidence 702 (ECF No 119).

---

[1]     All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

The motion is fully briefed and ripe for disposition. (ECF Nos. 121, 143, 154).  The parties stipulated that a hearing on the motion was not necessary and rested on the briefs. (ECF No. 161). For the reasons below, BNY Mellon's motion is denied.

## II.    BACKGROUND

Because the Court writes solely for the parties, only those facts necessary to decide this motion will be recounted.  The Waldens hired BNY Mellon to provide discretionary investment management services under a fiduciary standard.  In 2014, they signed a client agreement with BNY Mellon and transferred several million dollars to BNY Mellon for it to invest in its discretion under the client agreement.  The agreement provided that BNY Mellon be a fiduciary in connection with the investment agreement and provided that the investment manager would not, in its sole discretion, invest any funds affiliated with BNY Mellon.  According to the Waldens, BNY Mellon not only invested in affiliate funds, but collected fees and received other unauthorized compensation because of these investments.  The Waldens seek class treatment of their claims.

To support their claims, the Waldens retained Dr. O'Neal as an expert to provide the following opinions: Whether BNY Mellon has a conflict of interest with its use of affiliated funds but failed to identify or explain the conflict; whether BNY Mellon also had a conflict of interest relating to its cash handling and failing to disclose that conflict, and whether those issues could be analyzed on a class-wide basis. Waldens' Resp. Br. (ECF No. 154) at 6-7.[2]

BNY Mellon now moves to exclude these opinions, arguing that Dr. O'Neal is unqualified to opine on conflicts of interest and disclosures thereof in the investment industry, that his opinions are based on an erroneous legal premise, are inadmissible legal conclusions and impermissibly tell

---

[2]       The pinpoint cites refer to the electronic filing page number.

the fact finder what conclusion to reach, and that his opinions lack factual foundation and do not "fit" the case.

Along with the present *Daubert* motion, pending before the Court are a motion for summary judgment and a motion for class certification. Because "[t]he United States Supreme Court has strongly suggested that a full examination pursuant to the decision in *Daubert [v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)], is necessary prior to class certification[,]" the Court will decide the pending *Daubert* motion before class certification. *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 33 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) (citations omitted). *See also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*."). The Waldens seek to certify the following class:

> All persons who, or entities that, during the period 2014 to present (the "Class Period"), contracted with BNY Mellon to receive investment advice for their investment assets and for whom BNY Mellon used its discretionary authority to purchase, or recommend, or otherwise caused, the purchase of, investment fund vehicles that were financially affiliated with BNY Mellon or BNY Corp. or the deposit of cash into bank accounts at BNY Mellon or related banks.

(ECF No. 106).

### III.    STANDARD OF REVIEW

Federal Rule of Evidence 702[3] provides:

---

[3]    Federal Rule of Evidence 702 was amended as of December 1, 2023 after briefing was submitted on this motion. The amendment did not substantively change the legal standard applicable to *Daubert* motions and the Court will consider Dr. O'Neal's testimony under the amended standard. See Comments to 2023 Amendments to Fed. R. Evid. 702 (explaining the amendments to Fed. R. Evid. 702 includes clarification of the preponderance of the evidence

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In determining whether an expert's testimony is admissible under Fed. R. Evid. 702, the court acts as a "gatekeeper" to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, i.e., reliability; and (3) the expert's testimony must assist the trier of fact, i.e., fit." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (internal quotation marks, alterations and citations omitted). "The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence." *City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, No. CIV.A. 12-5275, 2015 WL 5097883, at *4 (D.N.J. Aug. 31, 2015).

As for the first requirement, courts "have interpreted Rule 702's requirements concerning specialized knowledge fairly liberally and have held 'that a broad range of knowledge, skills, and training qualify an expert as such[.]' " *United States v. Bridges*, --- F.App'x ---, No. 21-1679, 2022

_____

standard to be applied by courts when determining an expert opinion's admissibility).

WL 4244276, at *8 (3d Cir. Sept. 15, 2022) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).  The expert need not "be the best qualified or . . . have the specialization that the court considers most appropriate[.]" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 741).

In determining reliability, the court should consider the following non-exhaustive list of factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 742 n. 8.  These factors are neither exhaustive nor applicable in every case. *Kannankeril*, 128 F.3d at 806–07.  The inquiry should focus "on principals and methodology and not on the conclusions they generate.  The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Id.* at 807.  The reliability analysis "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (alteration in original) (citations and internal quotation marks omitted).  The reliability standard is not meant

> to be a high one, nor it is to be applied in a manner that requires the plaintiffs to prove their case twice – they do not have to demonstrate to a judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of [the] evidence that their opinions are reliable.  This is a very important distinction.  The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is

demonstrably correct.  Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology.

*Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000) (citations omitted).

There is "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and the "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 153 (1999) (citation omitted). Reliability of an expert's testimony "must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (citations omitted).

Rule 702's final requirement – "fit" – requires that "expert testimony . . . fit the issues in the case." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  In other words, "the expert testimony proffered [must be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173 (quotation marks, ellipses, and citation omitted).  If the testimony "has the potential for assisting the trier of fact[,]" Rule 702 has a "liberal policy of admissibility." *Id.* (the standard for "fit" is "not that high, but is higher than bare relevance.").  If the expert's testimony "does not relate to any issue in the case" it does not "fit" under Rule 702. *Daubert*, 509 U.S. at 591 (quotation marks and citations omitted). Additionally, an expert witness cannot render a legal opinion, as it usurps the role of the court in explaining the law to the jury. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).

## IV.    DISCUSSION

### a.   Dr. O'Neal's Qualifications

First, BNY Mellon argues that Dr. O'Neal is not qualified to testify as an expert on conflicts and disclosures in the investment industry.  BNY Mellon argues that Dr. O'Neal's education and academic work did not involve conflicts of interest or the sufficiency of their disclosure in the investment industry and only tangentially touched on conflicts in areas unrelated to the issues in this case by teaching courses addressing conflicts from brokerage commissions and he did not recall any specifics about teaching conflicts in academia. BNY Mellon Br. (ECF No. 121) at 9. BNY Mellon further argues that Dr. O'Neal's work at the SEC was quantitative and did not involve conflicts of interest or their disclosure, and he did not encounter conflicts of interest in his work as an investment advisor. *Id*. at 9-10.  BNY Mellon lastly argues that Dr. O'Neal has never previously opined as an expert in a lawsuit about conflicts of interest or the sufficiency of related disclosures including those in a discretionary investment relationship or investment in affiliated mutual funds ("AMFs"). *Id*. at 10.

The Rule 702 qualification requirement is applied liberally by courts, meaning that a "broad range of knowledge, skills, and training [can] qualify an expert[,]" and there is no requirement that the expert "be the best qualified" or have the "most appropriate" specialization in the field. *Pineda*, 520 F.3d at 244.

Dr. O'Neal has the requisite specialized expertise to testify about matters of conflicts and disclosures in the finance industry.  He received his Ph.D. in Finance from the University of Florida, Gainesville in 1993, was an assistant professor of finance at the University of New Hampshire, Auburn University, and Wake Forest University where he taught courses on investments and portfolio management, corporate finance and financial institutions, worked as a visiting economic scholar at the United States Securities and Exchange Commission where he provided expertise on mutual fund returns and performance, and for a time he managed his own

investment firm.  Dr. O'Neal testified that he specifically taught on the existence of conflicts of interest regarding mutual funds. Dr. O'Neal Dep. (ECF No. 154-3) at 28:4–29:2. Further, Dr. O'Neal has published several peer-reviewed articles on the investment industry, including an article on mutual fund share classes and broker incentives and was one of the first to identify a conflict of interest between securities brokers and customers arising from differences in brokers' compensation from selling different classes of mutual funds, (ECF No. 154-2) and an article on incentives in the banking industry involving banks' risk-taking behavior relating to customer deposits and regulatory and market factors. (ECF No. 154-4).  Dr. O'Neal testified that he likewise encountered conflicts during his tenure managing his own investment firm as a fiduciary. Dr. O'Neal Dep. (ECF No. 154-3) at 79:13-80:6.  Just as lawyers are bound by rules related to conflicts in client representation, so are fiduciaries in the investment industry. While, unlike Dr. O'Neal, every lawyer may not teach, be published, or come face to face daily with conflict of interest issues, they undoubtedly have specialized knowledge through their education, training and experience on conflicts of interest.  An expert need not be the best qualified or even have the specialization that the court considers the most appropriate, he must merely possess specialized expertise, which is interpreted liberally.  Considering Dr. O'Neal's extensive background, he has a broad range of knowledge that qualifies him as an expert to testify about matters of conflicts and disclosures in the finance industry, including with affiliate funds.  As for BNY Mellon's argument that Dr. O'Neal has never testified about these kinds of conflicts of interest as an expert in a court of law does not preclude him from being an expert in that field – it simply means he has not been asked to testify about that subject matter.  Any of the alleged shortcomings of Dr. O'Neal's experience propounded by BNY Mellon goes to his credibility and the weight of his testimony.

     b.  <u>Dr. O'Neal's Opinions as Erroneous Legal Conclusions</u>

Next, BNY Mellon argues that Dr. O'Neal's opinions are based on an erroneous legal premise, are inadmissible legal conclusions and impermissibly tell the fact finder what conclusion to reach.

BNY claims that Dr. O'Neal did not base his opinions and was not even aware of the governing legal framework under federal and Pennsylvania law that authorizes BNY to invest in AMFs, which expressly provide that such investments are not a presumed conflict of interest and prescribe the required disclosure. BNY Mellon Br. (ECF No. 121) at 11-12 (citing OCC's 12 C.F.R. pt. 9 ("Regulation 9") (providing that a national bank may invest a client's assets in AMFs if authorized by the law of the state governing the fiduciary relationship); 20 Pa. C.S. §§ 7209, 7211, 7772(c)(4), (c)(5), (h)(2), (h)(4), (h)(6) (providing investments in AMFs are not presumed to be a conflict and permits payment of reasonable compensation to affiliates of a corporate trustee if the compensation is disclosed to the current beneficiaries and the transaction is fair to the beneficiaries)).

An expert's opinion based upon an erroneous legal premise, is contrary to court rulings or based on markedly incorrect law is "per se unreliable and inadmissible under *Daubert*." *Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (collecting cases).

Insofar as BNY Mellon argues that Dr. O'Neal did not consider the applicable regulations when providing his expert opinion, this does not preclude his testimony. As argued by BNY Mellon, the applicable regulations provide that BNY may invest in AMFs and that such investments are not a **presumed** conflict of interest.  Assuming these regulations and applicable state law apply here, this does not mean that these types of investments are never a conflict of interest, rather, that they are not a *per se* conflict of interest.  In other words, it does not preclude

a finding that investments in AMFs can be a conflict of interest and as such, Dr. O'Neal's opinions that BNY Mellon's investments in AMFs are a conflict of interest are not contrary to law, especially when this Court has not ruled otherwise.

BNY Mellon also takes issue that Dr. O'Neal uses phrases like he "found no evidence" that BNY Mellon disclosed "material" conflicts of interest and argues by so testifying Dr. O'Neal usurps the function of the Court and jury by offering these legal opinions. BNY Mellon Br. (ECF No. 121) at 12-13.

Dr. O'Neal's use of the phrases that he "found no evidence" of disclosure of "material" conflicts of interest may have legal significance when read with legal-tinted glasses, but the use of those phrases does not automatically turn Dr. O'Neal's opinions into a legal opinion.

In his report, after Dr. O'Neal stated that BNY Mellon changed the disclosures provisions in their AMFs document in late 2016 or early 2017, he explains that he "found no evidence that BNY Mellon otherwise disclosed these conflicts prior to this addition to the affiliated mutual funds disclosure document.  It is not clear from my reading of the record exactly what date the first affiliated fund disclosure document with this new language would have been sent." Dr. O'Neal's Ex. Rep. (ECF No. 154-1) at ¶¶ 35-36.  Dr. O'Neal added that he "found no evidence that BNY Mellon ever provided clients clear disclosures about the following conflicts of interest" and he lists several disclosures he opines should have been made under industry standard. Dr. O'Neal's Ex. Rep. (ECF No. 154-1) at ¶ 38.

A fair reading of Dr. O'Neal's testimony shows that he was providing his opinion on based on record evidence when the disclosures were made and what disclosures should have been made under industry standard and was not offering a legal opinion or trying to usurp the role of the Court or jury by using phrases like "found no evidence" of BNY Mellon disclosing "material conflicts

of interest". Dr. O'Neal does not, for example, testify that the failure to disclose potential conflicts of interest breached BNY Mellon's fiduciary duties to Plaintiffs. That said, this Court will not consider any expert testimony it considers as masquerading as legal opinion and may enter appropriate orders at or before trial preventing the use of such.

c. Dr. O'Neal's Opinions as Lacking Factual Foundation

BNY Mellon next argues that Dr. O'Neal's opinion that BNY had financial incentives to invest in AMFs lacks factual foundation, are based on impermissible speculation, are contrary to record evidence and contrary to some of his own opinions and should be excluded. BNY Mellon argues that while Dr. O'Neal opined that BNY Mellon had a financial incentive to allocate portfolios into AMFs because BNY Mellon received more total revenue from such allocations, Dr. O'Neal did not conduct any analysis to determine whether the allocation into AMFs generated greater revenue or profit for BNY Mellon. BNY Mellon Br. (ECF No. 121) at 14-15. BNY Mellon further argues that the Waldens' accounts reveal that BNY Mellon earned less revenue from investing in AMFs and that each transaction for each BNY Mellon customer would have to be evaluated to determine whether BNY Mellon was advantaged or disadvantaged. *Id.* BNY Mellon further argues that Dr. O'Neal's opinion that the BNY Mellon wealth advisors were incentivized to select AMFs because AMFs generated higher overall profits for BNY Mellon is not supported by the evidence. *Id*. at 15-16. BNY Mellon also argues that Dr. O'Neal's opinion that BNY Mellon has an incentive to allocate cash balances to cash reserve accounts rather than affiliated money market funds because BNY Mellon waived fees associated with the money market funds, should be deemed inadmissible because he failed to quantify the benefit to BNY Mellon, referenced no industry standard showing that this was a conflict of interest or that BNY Mellon failed to disclose

this practice, and that this conflict of interest theory contradicts the theory pleaded by Plaintiffs. *Id*. at 16-17.

Plaintiffs respond that the key issue in the case is whether BNY Mellon "identified or explained" the conflicts of interest alleged. They argue that Dr. O'Neal's testimony focuses on those issues and that he would describe the conflicts of interest he identified by BNY Mellon putting customers' cash in bank accounts instead of investing in money market funds and its use of affiliated funds, explain what disclosures professional standards mandated for those conflicts and whether he found such disclosures from BNY Mellon, and describe how he could use specific data and records to perform the analyses he did for the Plaintiffs' accounts for a proposed class of BNY Mellon's investment management customers. Waldens Br. (ECF No. 154) at 21-22. Plaintiffs argue that this testimony "fits" the case.  Plaintiffs maintain that Dr. O'Neal's testimony about BNY Mellon's incentives related to the use of affiliated funds is not based on impermissible speculation but based on BNY Mellon's own records, that Dr. O'Neal is qualified to opine on conflicts of interest that may not be the subject of legislation or regulatory or professional guidance, and that a review of Ms. Walden's account reveals she was disadvantaged by BNY Mellon's investment decisions, and that the fees exceeded the fee waivers. *Id*. at 22-24.

Dr. O'Neal's testimony is sufficiently tied to the facts of the case and will aid the jury in determining whether there were conflicts of interest under the industry standard and whether those purported conflicts were sufficiently identified or explained to BNY Mellon investment management customers. BNY Mellon's argument that Dr. O'Neal did not establish that BNY Mellon actually made more revenue or profits or benefitted in some way by allocating into AMFs or that he did not quantify those financial incentives is a merits-based issue.  Merits discovery has not yet occurred, so the fact that Plaintiffs, through Dr. O'Neal or some other witness, have not

proven that BNY Mellon actually made more revenue, profits, or benefitted in some way by allocating to AMFs or the quantification of that benefit on a class wide basis is not yet ripe for determination. At this juncture, Dr. O'Neal opined that Ms. Walden was "disadvantaged by BNY's investment decisions with respect to fees and fee waivers by $941[.]" Dr. O'Neal Dec. (ECF No. 154-9) at ¶ 6.  Further, Dr. O'Neal noted in his report that BNY Mellon acknowledged allocating to AMFs involved incentives for the bank when it updated its conflict disclosures in 2017 to state that "more assets in [AMFs] can reduce overhead and expense ratios, so that there is an incentive to invest new moneys . . . to . . . improve net investment performance[,]" using AMFs "can give those funds 'critical mass' so that they become and remain viable" and "[u]sing only [AMFs] can reduce [BNY Mellon's] investment research expenses." Dr. O'Neal Ex. Rep. (ECF No. 154-1) at ¶ 35.  That the factual basis of BNY Mellon's benefit by allocating into AMFs is in dispute does not impact the admissibility of Dr. O'Neal's opinion, but impacts the credibility of his testimony, "and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 246 (S.D.N.Y. 2019).  To the extent BNY Mellon argues that Dr. O'Neal's analysis would require a customer-by-customer and transaction-by-transaction evaluation is a class certification issue to be determined in due course. Further, to the extent Dr. O'Neal's opinions purportedly contradict themselves by offering seemingly alternative conflict of interest theories not pleaded does not automatically deem his testimony inadmissible – rather, it goes to the weight and credibility given to his testimony. *See In re Johnson & Johnson Talcum Powder Products Mktg., Sales Pracs. and Prod. Litig.*, 509 F. Supp. 3d 116, 187 n. 50 (D.N.J. 2020).

Lastly, BNY argues that other courts have rejected Dr. O'Neal's opinions as lacking a factual basis and based on this alone the Court should deem his testimony inadmissible.  While

this may be true, just because a court has rejected or failed to credit an expert's opinion as lacking

factual basis in one case does not automatically mean his opinion should be excluded in another

case. The Court sees no basis to exclude Dr. O'Neal's opinions based on the cases cited by BNY

Mellon.

For these reasons, the following Order is entered:

AND NOW, this 18th day of January, 2024,

IT IS HEREBY ORDERED that BNY Mellon's motion to exclude the testimony of Dr.

O'Neal (ECF No. 119) is DENIED.

IT IS FURTHER ORDERED that as the Court has filed the entirety of this Memorandum

Opinion and Order under seal, the parties shall have until **February 2, 2024** to jointly propose a

redacted version of this Memorandum Opinion and Order to be filed publicly.


BY THE COURT:

s/Cynthia Reed Eddy
United States Magistrate Judge


cc:    Counsel of record via CM/ECF electronic filing


14