IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| STEPHEN WALDEN, LESLIE WALDEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; | ) ) ) ) | 2:20-CV-01972-CRE |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| THE BANK OF NEW YORK MELLON CORPORATION,  BNY MELLON, N.A., | ) ) ) | |
| Defendants, | ) ) ) | |

**MEMORANDUM OPINION[1]**

CYNTHIA REED EDDY, United States Magistrate Judge.

## I.   INTRODUCTION

This putative class action was initiated in this Court on December 21, 2020 by Plaintiffs Stephen and Leslie Walden (collectively "the Waldens"), individually and on behalf of those similarly situated, against Defendants Bank of New York Mellon Corporation and BNY Mellon, N.A. (collectively "BNY Mellon").  The Waldens generally assert breach of contract claims and claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 *et seq*. ("UTPCPL") in connection with investment management services BNY Mellon provided to the Waldens under investment management agreements.

Presently before the Court is a pre-class certification motion for summary judgment by BNY Mellon. (ECF No. 98).  The motion is fully briefed and ripe for disposition. (ECF Nos. 102,

---

[1]     All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

103, 148, 152, 153). The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) (providing for original jurisdiction in situations where the amount in controversy exceeds $5 million and is a class action in which any member of the class of plaintiffs is a citizen of a different state from any defendant). For the reasons that follow, BNY Mellon's motion is granted in part, deferred in part, and denied in part.

## II.     BACKGROUND

Unless otherwise indicated, the following facts are not in dispute. The Waldens bring this putative class action against BNY Mellon for a breach of contract and UTPCPL violations for allegedly failing to disclose conflicts of interest for BNY Mellon's investment of their assets into affiliated mutual funds. The Waldens allege it was a conflict of interest for BNY Mellon to not disclose financial incentives related to BNY Mellon's investment of clients' assets in affiliated mutual funds, including for BNY Mellon requiring its employees choose funds from a predetermined program called the "Solutions Matrix" which was comprised almost entirely of affiliated funds, implementing a compensation structure for its employees that incentivized investment of clients' assets into affiliated mutual funds, and for BNY Mellon to place the Waldens' cash assets into BNY Mellon cash reserve accounts with lower or no returns and that charged fees rather than money market funds with higher returns and included fee waivers. Waldens' Resp. Br. (ECF No. 152) at 6.

### a.  Agreement Provisions and Account Statements

The Waldens and BNY Mellon engaged in discussions in 2014 for the purpose of the Waldens retaining BNY Mellon as a wealth manager. The Waldens met with BNY Mellon on April 9, 2014 to sign account agreements for wealth management accounts opened with BNY Mellon. The Waldens opened the following accounts with BNY Mellon: Leslie Walden individually opened an Investment Management Account ("IMA"), a Traditional Investment

2

Retirement Account ("IRA"), and a Roth IRA; Stephen Walden individually opened a Traditional

IRA and a Roth IRA, and they jointly opened an IMA (collectively the "Agreements").

All the Agreements provided that BNY Mellon shall be a fiduciary "with respect to the

discretionary investment management powers set out in the [Agreements][,]" and BNY Mellon

"shall not have any other fiduciary duties or responsibilities" to the Waldens. BNY Mellon

Statement of Material Fact ("SMF") (ECF No. 102) at ¶ 22.  The Waldens' expert, Dr. Edward

O'Neal indicated in his report that according to the Office of the Comptroller of the Currency

("OCC"), this fiduciary responsibility is important because of conflicts of interest that arise with a

bank's potential self-dealing when providing investment advice and when compensation is not

clearly disclosed. Dr. O'Neal Report (ECF No. 104-34) at ¶ 18.  Dr. O'Neal states that the OCC

provides:

> Banks that provide asset management services for clients may be required to
> manage or avoid various actual or potential conflicts of interest.  Conflicts of
> interest arise whenever a bank engages in self-dealing and in any situation where a
> bank's ability to act in the best interests of its account beneficiaries or clients is
> impaired.  Self-dealing occurs when a bank, as fiduciary, engages in a transaction
> with itself or related parties and interests. Conflicts of interest may also arise when
> a bank benefits from undisclosed compensation or receives unreasonable
> compensation, or when a bank or a bank employee engages in unethical conduct.

Dr. O'Neal Report (ECF No. 104-34) at ¶ 18 (quoting Comptrollers Handbook, Asset

Management, *Conflicts of Interest*, Version 1.0, January 2015, Office of the Comptroller of the

Currency, p. 1).

Dr. O'Neal further states that the OCC outlines the potential for conflicts by placing

fiduciary assets into affiliated funds:

> Fiduciaries with investment discretion are required to make decisions concerning
> the investment of fiduciary assets based exclusively on the best interests of the
> fiduciary account.  The use of investment products offered or sponsored by a bank
> fiduciary or an affiliate for which the bank or affiliate receives compensation
> represents a conflict of interest because the revenue generated by such products

may affect the fiduciary's best judgment when deciding how to invest fiduciary funds. Bank fiduciaries with investment discretion should have processes in place to

- identify potential conflicts of interest related to proprietary investment products,
- ensure that the use of proprietary investment products is authorized by applicable law and disclosed in accordance with applicable law, and
- ensure that such products are prudent investments for each account consistent with applicable law.

Dr. O'Neal Report (ECF No. 104-34) at ¶ 19 (quoting Comptrollers Handbook, Asset Management, *Conflicts of Interest*, Version 1.0, January 2015, Office of the Comptroller of the Currency, p.8.). Dr. O'Neal further opines that the best practice of handling conflicts of interest is to avoid them, and where they cannot be avoided, to manage and disclose them. Dr. O'Neal Report (ECF No. 104-34) at ¶ 20.

The Agreements provided that the Waldens' accounts were managed by BNY Mellon on a discretionary basis, meaning, that the investment advisor made the day-to-day investment decisions for the account without requiring approval from the Waldens for each of those decisions. BNY Mellon SMF (ECF No. 102) at ¶ 22. The Agreements further provide that BNY Mellon shall only be liable for its own negligence or bad faith and shall not be liable for "any consequential, indirect, incidental, or special damages." *Id*. at ¶ 23.

The IMA accounts include an "Affiliated Funds Authorization/Disclosure" which provide:

[The Waldens] understand[] and acknowledge[] that in investing the Property in pooled investment vehicles, such as mutual funds, Delaware statutory trusts, limited partnerships, exchange traded funds, etc. ("vehicles"), [BNY Mellon] will typically invest in vehicles advised by [BNY Mellon] or an affiliate. [The Waldens] authorize[] [BNY Mellon] to invest any Property of an Account in one or more vehicles advised by [BNY Mellon] or an affiliate. [The Waldens] understand[] and acknowledge[] that if [BNY Mellon] or any of its affiliates is the advisor for any vehicle in which [the Waldens'] assets are invested, or performs any other services for the vehicle:

a) [BNY Mellon] may receive its regular and usual management or

> services fees from vehicle;
>
> b) management fees are based on the value of the assets in the vehicles, as described in the vehicle's prospectus or offering documents, as applicable; and
>
> c) such fees may be in addition to [BNY Mellon's] compensation for its services provided under this IMA.

Investment Mgmt. Agreement (ECF No. 17-5 at p. 8-9).

The IRA Account Agreements which are applicable to the IRA and Roth IRA accounts authorizes BNY Mellon to

> purchase, own and sell shares of registered investment companies ("Funds") on behalf of [the Waldens], including Funds for which [BNY Mellon] or an affiliate provides investment management, transfer agency, shareholder servicing, custody, administration, brokerage and/or other services ("Affiliated Funds"). [BNY Mellon] and its affiliates shall be entitled to receive fees and compensation in connection with various services rendered to Affiliated Funds.

IRA Trust Account Agreement (ECF No. 17-8 at p. 6). The IRA Account Agreements further provide that BNY Mellon is "authorized to invest the assets of your . . . Account in mutual funds, including those mutual funds managed, advised or administered by BNY Mellon Fund Advisors, a division of the Dreyfus Corporation, an affiliate of BNY Mellon, or other affiliates of BNY Mellon." BNY Mellon SMF (ECF No. 102) at ¶ 27.

The Agreements also contain a "Notification of Disagreements" provision that provides that the Waldens must promptly report to BNY Mellon "any error or disagreement concerning Account statements and transaction confirmations," and that "[a]ny disagreement with respect to the Account statements and confirmations must be made known to [BNY Mellon] within 90 days after the statement or confirmation is received, otherwise [the Waldens] will be deemed to have approved the statement and the reported transactions." *Id*. at ¶ 46.

Throughout their relationship, the Waldens received monthly account statements, and on at least two of the account statements, in June and August 2014, included were several BNY

Mellon and Dreyfus affiliated mutual funds purchased on the Waldens' behalf. *Id.* at ¶ 50.  The

June 2014 Statement further included that BNY Mellon

> may, where appropriate, invest your account in one or more investment companies,
> including mutual funds (Funds), for which affiliates may provide investment advice
> and other services relating to these investments. Funds may be subject to fees and
> charges as described in the Fund's prospectus, or other documents provided by
> BNY Mellon.  Affiliates are compensated for these services and transactions in
> accordance with applicable law.

*Id.* at ¶¶ 52-53.

Leslie Walden testified that she did not realize or recall that by signing the Agreements she

authorized BNY to place her funds in affiliated mutual funds and Stephen Walden testified that he

had no recollection of reviewing the Agreements. L. Walden Dep. (ECF No. 104-2) at 116:25-

117:2; 163:25-164:8; L. Walden Dep. Vol. II (ECF No. 104-6) at 119:13-20; S. Walden Dep. (ECF

No. 104-1) at 117:5-119:20.

### b.  Account Fees

The Agreements all include provisions that BNY Mellon charges certain account fees to

the Waldens.

As to the IMA accounts, BNY Mellon charges an advisory fee and an investment

management fee, which are based on assets under management including, stocks, bonds, cash

investments, holdings in money market accounts and hedge funds. BNY Mellon SMF (ECF No.

102) at ¶ 13; Dr. O'Neal Report (ECF No. 104-34) at ¶ 23.  The level of the fees charged is based

per annum and based on the total assets under management in all BNY Mellon investment

accounts, including the IRA and Roth IRA accounts. BNY Mellon SMF (ECF No. 102) at ¶ 13;

Dr. O'Neal Report (ECF No. 104-34) at ¶ 23.  The investment management fee was not charged

on, *inter alia*, affiliated mutual funds or money market funds. Dr. O'Neal Report (ECF No. 104-

34) at ¶ 23. The fee schedule for the IMA accounts is as follows:

| Asset Range | Advisory Fee | + | Investment Management Fee* |
|---|---|---|---|
| $0 - $3M | 0.75% | | 0.50% |
| Next $2M | 0.60% | | 0.25% |
| Next $10M | 0.45% | | 0.20% |
| Next $10M | 0.35% | | 0.15% |
| Next $25M | 0.25% | | 0.15% |
| Over $50M | 0.20% | | 0.15% |
| | | | * **not** charged on affiliated funds |

*Id*. The minimum advisory fee was $15,000 per year and in most months that the Waldens' IMA accounts were open, the Waldens were subject to the minimum fee. *Id*.

As to the IRA and Roth IRA accounts, these accounts were subject to a single Account Fee which was charged on all assets managed by BNY Mellon except, *inter alia*, affiliated mutual funds and money market funds. BNY Mellon SMF (ECF No. 102) at ¶ 13; Dr. O'Neal Report (ECF No. 104-34) at ¶ 24. The fee schedule for the IRA and Roth IRA accounts is as follows:

| Asset Range | Account Fee* |
|---|---|
| $0 - $3M | 1.25% |
| Next $2M | 0.85% |
| Next $10M | 0.65% |
| Next $10M | 0.50% |
| Next $25M | 0.40% |
| Over $50M | 0.35% |

| | * **not** charged on affiliated funds |
|---|---|

Dr. O'Neal Report (ECF No. 104-34) at ¶ 24.

The total combined assets of all six of the Waldens' accounts were valued at between $4M and $4.5M. *Id*. at ¶ 26. The Waldens' non-qualified IMA account assets averaged $1.93M and their qualified IRA account assets had an average value of approximately $2.36M. *Id*. at ¶ 26.

According to the Waldens, in addition to the advisory and investment management fees in the IMA accounts and the account fees in the IRA and Roth IRA accounts, the Waldens also incurred fees in the affiliated mutual funds and money market funds purchased in their BNY Mellon accounts, but these fees do not show up as explicit fees in the BNY Mellon account statements received by the Waldens, but are rather internal to the funds and would be reflected as an annual percentage of net mutual fund assets in fund prospectuses or annual reports. *Id*. at ¶ 27. The Waldens claim that BNY Mellon or its affiliates accrued these charges for affiliated mutual funds, whereas if the Waldens were sold unaffiliated funds, the internal fund fees would not accrue to BNY Mellon. *Id*. at ¶ 27. They claim that during the period BNY Mellon managed their accounts, they paid a total of $16,325 in investment management fees, $41,092 in advisory fees and $40,813 in account fees. *Id*. at ¶ 28. The Waldens estimate that they incurred $40,613 in affiliated expenses from the affiliated mutual funds placed into their accounts and the total amount paid to BNY Mellon for fees and expenses was $138,845. *Id*.

According to BNY Mellon, affiliated mutual funds charge fees for the services provided to them and some of those services are provided by affiliates of BNY Mellon. BNY Mellon SMF (ECF No. 102) at ¶ 14. While these fees are separate from the fees charged by BNY Mellon for IMA and IRA accounts, BNY Mellon waives the investment management fee in the IMA accounts

and the account fee in the IRA and Roth IRA accounts on those assets. *Id*.

The IRA accounts provide that "BNY Mellon will exclude the value of shares of the Affiliated Mutual Funds from the total account value for Account fee calculation purposes. This exclusion will be applied when a BNY Mellon affiliate, such as The Dreyfus Company, is the investment advisor to the Fund and it hires an unaffiliated sub-adviser. This exclusion is designed to avoid duplicate investment advisory fees for managing the same assets." *Id*. at ¶ 31. The IRA accounts further provide that "[a] portion of the Affiliated Mutual Fund's investment advisory fee is credited to BNY Mellon Wealth Management for internal bookkeeping purposes when BNY Mellon-managed accounts are invested in that Affiliated Mutual Fund." *Id*. at ¶ 32. According to BNY Mellon, the IRA accounts identify the fee details for the Affiliated Mutual Funds and set out three categories of mutual fund fees that are paid directly by the mutual fund for various expenses provided (with the combination of such fees amounting to the "expense ratio") such that the fund's returns are net of those fees:

- The investment advisory or sub-advisory fee is paid for the investment advisory services provided to the mutual fund. The investment advisor is hired and its compensation is approved by the board of directors or trustees of the mutual fund and then that arrangement is approved by the shareholders of the mutual fund. The advisory fee is paid by the mutual fund and is included in the expense ratio.

- Other fees paid to affiliates of BNY Mellon include a custody fee, fund administration fee, shareholder communications expenses, transfer agent/recordkeeper services fees and expenses, securities lending agent fees, shareholder account servicing fees, and other miscellaneous non-advisory fees.

- Fees paid to non-affiliates, such as board of directors or trustees fees, professional services fees, independent pricing services, certain insurance premiums, registration fees, and other miscellaneous fees.

*Id*. at ¶ 33. The Waldens respond that the IRA accounts only partially identify "the fee details for the Affiliated Mutual Funds" and "they fail to disclose that BNY Mellon and its affiliates had

significant financial interests in how they used their sole discretion to choose to invest in either affiliated or non-affiliated funds for their customers – including by purchasing affiliated funds, [BNY Mellon] garnered higher all-in fees if the affiliated fund expense ratio paid to BNY Mellon was higher than the fees that it waived on affiliated investments." Waldens' Resp. SMF (ECF No. 153) at ¶ 33 (cleaned up).

The IRA accounts further provided that the Waldens approved "the initial and ongoing investment" of their assets into affiliated mutual funds "without limitation" and authorized "the payment of investment advisory and other fees by the Affiliated Mutual Fund to [BNY Mellon] or any affiliate of [BNY Mellon] and revenue sharing between the Affiliated Mutual Fund manager and [BNY Mellon] and its affiliates" and "to receive payment from the Affiliated Mutual Funds service providers for various services rendered[.]" BNY Mellon SMF (ECF No. 102) at ¶ 34.

At his deposition, Stephen Walden was asked about the account fees and testified as follows:

> Q.     So you have no knowledge or information with respect to any fees that are being alleged in the complaint that have been paid but not disclosed on IMA accounts, right?
>
>        [Objection lodged].
>
> A.     To your question, yes.
>
> Q.     . . . Now, specific to the IRA and ERISA funds, can you identify for me any fees which you contend you paid which were not otherwise disclosed?
>
>        [Objection lodged].
>
> A.     You have a question being – off the top of my head, no, I have no complaint about fees.

S. Walden Dep. (ECF No. 104-1) at 105:1-8; 108:10-21.

Similarly, Leslie Walden testified about account fees as follows:

> Q.      Well, if we saw them [the fees] yesterday, would you agree that they were disclosed, right?

[Objection lodged].

A.      They were noted, yes. . . .

Q.      Yes. And if you read them [the fees], they were disclosed, right?

A.      Yes, we read them.

L. Walden Dep. Vol. II (ECF No. 104-6) at 295:4-302:13.

It is undisputed that the Waldens were charged the fees that were disclosed to them in the Agreements' fee schedules.  The Waldens claim that it is immaterial that they do not dispute the accuracy of the fees charged because their "allegations are that [BNY Mellon] failed to disclose conflicts of interest." Waldens' Resp. SMF (ECF No. 153) at ¶ 75.

BNY Mellon also argues that by investing in affiliated mutual funds instead of unaffiliated funds, BNY Mellon earned revenue of $40,613 for managing the funds, but waived $50,800 of fee revenue, resulting in $10,200 lower overall revenue to BNY Mellon and a benefit to the Waldens of $50,800. BNY Mellon SMF (ECF No. 102) at ¶ 91.

In late 2016, early 2017, BNY Mellon changed the disclosure document for IRA and ERISA accounts and included a list of ████████████████████████████ Dr. O'Neal Report (ECF No. 104-34) at ¶ 36 (citing Affiliated Mutual Fund disclosure at BNYM005614 – 005619).  The new disclosure stated:





*Id.* (quoting Affiliated Mutual Fund disclosure at BNYM005614 – 005619).

### c. Compensation and Incentives

The Waldens also claim it was a conflict for BNY Mellon not to disclose certain financial incentives, including wealth manager compensation, the use of the Solutions Matrix for investing assets and the placement of cash investments into a bank-owned sweep or cash reserve account as opposed to a money market fund.

### i. Wealth Manager Compensation



██████████████████  BNY Mellon SMF (ECF No. 102) at ¶ 87. ████████████

████████████████████████████████████████████████████████████████

████  *Id*. at ¶ 88.  According to the Waldens, this compensation structure engendered a conflict of interest because the more money both BNY Corp. and BNY Wealth Management made, the individual wealth managers made a higher bonus and because a discretionary investment decision to accrue affiliate fund fees to BNY Wealth Management would increase the individual wealth manager's compensation. Dr. O'Neal Report (ECF No. 104-34) at ¶ 50.

The Waldens also maintain that wealth managers are compensated for investing or holding clients' assets in affiliated mutual funds by allocating cash to bank accounts rather than money market funds because BNY Mellon waives the investment management or account fees when wealth managers invest in money market funds, but does not waive those fees when cash is allocated to bank accounts. Waldens' Resp. SMF (ECF No. 153) at ¶ 88.  The Waldens claim that BNY Mellon "generally profit[s] by allocating non-retirement accounts to affiliated funds. Although [BNY Mellon] generally had a disincentive to allocate the Waldens' retirement accounts to affiliated funds because the tiered fee applicable to them was 1.25%, which exceeded many of the affiliated funds, for clients at higher fees, the same incentives for non-retirement accounts would apply to retirement accounts[, and BNY Mellon] had a financial incentive to select riskier affiliated funds, as such products generally have higher fees." *Id*.

ii.  Solutions Matrix

According to the Waldens, BNY Mellon's Wealth Management Solutions Strategy Committee developed a "Solutions Matrix" which contained an approved set of investments (model portfolios, mutual funds, hedge funds) that its individual wealth managers could place into clients' discretionary managed accounts. Dr. O'Neal Report (ECF No. 104-34) at ¶ 40.  The

Solutions Strategy Committee approves, removes, and monitors the investment solutions available to BNY Wealth Managers and according to the Waldens, most of the investment solutions in the Matrix at the relevant time were BNY Mellon-affiliated mutual funds. Dr. O'Neal Report (ECF No. 104-34) at ¶¶ 40, 42.  The Waldens maintain that because the Solutions Matrix is so overwhelmingly weighted toward affiliated funds, the Matrix is designed such that client accounts holding mutual funds from the Matrix must be almost exclusively invested in BNY Mellon affiliated funds. *Id*. at ¶ 44.  The Waldens maintain that by purchasing affiliated funds, BNY Mellon garnered higher all-in fees if the portion of the affiliated fund expense ratio paid to BNY Mellon was higher than the fees that BNY Mellon waived on affiliated investments. *Id*. at ¶ 39. For example, the investment management fee that was waived on affiliated investments was, at most, 0.50% and for most, if not all the affiliated mutual funds, the portion of the expense ratio that was paid to BNY Mellon affiliates was greater than 0.50%. *Id*. at ¶ 45.  Therefore, the Waldens claim that BNY Mellon received a financial benefit by purchasing affiliated mutual funds with fees greater than 0.50% on the Solutions Matrix, rather than unaffiliated funds, and that nearly all the funds selected for the Solutions Matrix had fees greater than 0.50%. *Id*. at ¶ 45. The Waldens also allege that BNY Mellon had a financial incentive to allocate client assets to riskier funds, like mutual funds, instead of to less risky funds, like for example, bond funds, because mutual funds garnered higher fees than bond funds. *Id*. at ¶ 46.  BNY Mellon maintains that placing client assets into affiliated mutual funds may increase revenue to BNY Mellon but does not necessarily increase profits. Gleason Report (ECF No. 104-38) at p. 26 § 6.

### iii.   Money Market Funds vs. Bank-Owned Sweep Accounts

The Waldens further allege that BNY Mellon's financial incentives extended to its decision to place the Waldens' cash investments into bank-owned sweep accounts instead of money market

funds. Dr. O'Neal Report (ECF No. 104-34) at ¶ 47.  They claim that all their cash assets throughout the investment period were placed into a Cash Reserves Account ("CRA") and had an average cash balance of $188k from October 2014 through March 2017.  In 2014 and 2015, the CRA assets earned 0% interest. *Id*. at ¶ 54.  In 2016 and 2017, the yield on the CRA assets was between 0.1% and 0.3%. *Id*. at ¶ 55.  But, because the Waldens were paying 0.5% in investment management fees for their IMA accounts investing in the CRA, they were losing money on these assets without any possibility of earning positive returns. *Id*. at ¶ 55.  According to the Waldens, they would have been eligible for a waiver of the account fee in their IRA accounts or the investment management fee in their IMA accounts if their cash investments were placed in money market funds. *Id*. at ¶ 47.  For example, yields in affiliated money market funds were close to zero in 2014 and 2015, similar to the CRA, and between .14% and .78% in 2016 and 2017. But, because their cash investments were placed in a bank-owned sweep account, they were charged the account fee/investment management fee. *Id*.  The Waldens claim that the advantages or disadvantages of placing their cash investments in a money market fund instead of a bank-owned sweep account was not disclosed to them, and it was not in their best interest to hold cash assets in a CRA account rather than a money market fund. *Id*. at ¶ 48.

While BNY Mellon disputes that money market funds were available to the Waldens because they did not have enough assets managed to qualify for such a fund, it appears that there may have been one money market fund available to the Waldens based on their managed assets. *See* Dr. O'Neal Rebuttal Report (ECF No. 104-35) at ¶ 6.  BNY Mellon also maintains there are significant individualized advantages to placing funds in cash reserve accounts, like FDIC insurance and liquidity advantages. Gleason Report (ECF No. 104-38 at p. 35).

### d.  Communications Between the Waldens and BNY Mellon Advisors

In January 2016, Stephen Walden e-mailed BNY Mellon regarding the affiliation between Dreyfus and BNY Mellon and indicating that his "biggest overall issue . . . is with the performance of the Dreyfus and Mellon funds [BNY Mellon] selected. . . . I know you have an affiliation with Mellon and believe you may also have a relationship with Dreyfus. A[t] a minimum, we'd like to have a frank discussion with you about why these particular funds were selected." BNY Mellon SMF (ECF No. 102) at ¶ 78.  Later in January 2016, Stephen Walden sent an email to BNY Mellon in which he indicated the Waldens were concerned with performance of the affiliated funds and are "OK with good funds – regardless of their affiliation." *Id*. at ¶ 81. In December 2016, Stephen Walden sent another email to BNY Mellon indicating the Waldens had concerns with the poor performance of the proprietary BNY and Dreyfus funds and did not believe these investments were in their best interests. *Id*. at ¶¶ 83-84.  In February 2017, BNY Mellon ended the investment relationship with the Waldens. *Id*. at ¶ 96.

### e.  Procedural History

After a motion to dismiss filed by BNY Mellon, the following claims remain: a breach of contract claim and two claims for violations of UTPCPL.  The Waldens' breach of contract claim asserts that BNY Mellon breached the Agreements by: (1) purchasing securities issued by BNY Corp. or its affiliates; (2) with respect to the IRA Accounts, purchasing affiliated mutual funds beyond those enumerated in the pre-authorization list; (3) instead of making individualized assessments of client needs, using a predetermined program that preferred underperforming, conflicted affiliated funds that charged excess fees and underperformed; (4) causing BNY Mellon to make more money than authorized in the Agreements and causing their clients to be charged fees other than those promised in the Agreements and (5) engaging in self-dealing transactions

instead of managing their funds according to a fiduciary standard. *Id*. at ¶ 99.[2]  The Waldens'

UTPCPL claims allege that BNY Mellon made affirmative misrepresentations in the Agreements

and on their website that BNY Mellon would act in conformance with their fiduciary duties, put

their clients' interests ahead of their own, choose investments that aligned with their clients'

objectives, and prudently invest their client funds and deceptively omitted that they would not do

those things, they misrepresented that wealth managers would not receive compensation from

underlying transactions, they did not disclose the conflicts of interest, specifically that BNY

Mellon or its advisors would receive unauthorized commissions, fees, incentive payments, or other

compensation for placing clients in affiliated mutual funds, the Waldens relied on these statements

and omissions and would not have opened accounts at BNY Mellon absent them, and the Waldens

were damaged by paying advisory and investment management fees while BNY Mellon acted as

an unfaithful fiduciary. *Id*. at ¶ 101.[3]

The parties engaged in a first phase of discovery on the merits of the Waldens' claims and

the Federal Rule of Civil Procedure 23 requirements.  BNY Mellon moved for summary judgment,

after which, The Waldens filed a motion for class certification.  The motion for class certification

was held in abeyance pending the Court's decision on the instant motion. (ECF No. 160).

## III.    STANDARD OF REVIEW

The standard for assessing a motion for summary judgment under Rule 56 of the Federal

---

[2]      The Waldens dispute that this portrayal describes "all allegations related to the breach of contract claim" but fails to include any specific denials or include specific allegations that are missing related to their breach of contract claim, and these generalized denials will not be considered.

[3]      Again, the Waldens dispute that this portrayal describes "all allegations related to the UTPCPL claim" but fails to include any specific denials or include specific allegations that are missing related to their UTPCPL claims, and these generalized denials will not be considered.

Rules of Civil Procedure is well-settled. A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. *Id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

A plaintiff may not, however, rely solely on his complaint to defeat a summary judgment motion. *See, e.g., Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a

properly supported motion for summary judgment may not rest upon mere allegation or denials of

his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").

Allegations made without any evidentiary support may be disregarded. *Jones v. United Parcel*

*Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

## IV.    DISCUSSION

### a.   Breach of Contract

In Pennsylvania, "[i]t is well-established that three elements are necessary to plead a cause

of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a

breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck,*

*P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

The basis of the Waldens' breach of contract claim is that the Agreements imposed a

fiduciary duty on BNY Mellon as their financial advisor and that BNY Mellon "had undisclosed

financial incentives to invest customers' assets in affiliated funds rather than non-affiliated funds

and [placing clients' cash assets] in BNY [Mellon] [sweep] accounts rather than money market

funds with higher returns" and that BNY Mellon "required their employees to pick funds from a

confidential 'Solutions Matrix' consisting almost solely of affiliated funds and implemented a

bonus system that incentivized employees to maximize BNY [Mellon's] profits instead of

customer returns" and "did not adequately explain these conflicts of interest to customers like the

Waldens." Waldens' Resp. Br. (ECF No. 152) at 6.

BNY Mellon argues that the Waldens' breach of contract claims fail for several reasons.

First, BNY Mellon argues that its investment of clients' assets into affiliated mutual funds was

repeatedly disclosed.  Specifically, BNY Mellon argues that the Agreements executed by the

Waldens disclosed that BNY Mellon "typically invest[s]" in affiliated mutual funds, that the

Waldens' received monthly statements, yearly affiliated mutual fund disclosures, publicly available prospectuses and other written and oral communication that disclosed investment in affiliated mutual funds, and the Waldens expressly authorized these investments in their communications to BNY Mellon. BNY Mellon Br. (ECF No. 103) at 9.

The Waldens respond that despite BNY Mellon's fiduciary obligation, they failed to disclose conflicts of interest related to BNY Mellon's "purchases of affiliated funds[,]" "their handling of cash in customer accounts, and their incentive compensation for employees." Waldens' Resp. Br. (ECF No. 152) at 15.

It is undisputed that BNY Mellon disclosed to the Waldens that it invested in affiliated mutual funds through the plain language of the Agreements, account statements and through direct communications between the Waldens and BNY Mellon.  However, the crux of the Waldens' (and the putative class's) claims is that BNY Mellon failed to disclose the conflicts of interest created by BNY Mellon investing in affiliate funds.  According to the Waldens, through their expert Dr. O'Neal, it is a conflict of interest for BNY Mellon to invest in affiliated mutual funds because BNY Mellon had a financial incentive to allocate clients' assets to higher risk affiliated funds through the fees it charged, it incentivized their employees to select affiliated funds through the employee's compensation structure, it had a financial incentive to allocate client's cash balances to BNY Mellon bank accounts rather than money market funds, it did not disclose the use of the "Solutions Matrix" it used to invest the Waldens' assets and it was standard practice for other financial institutions acting in a fiduciary capacity to explicitly disclose the potential conflict of interest of investing in affiliated mutual funds. *See* Waldens' Resp. Br. (ECF No. 152) at 11; Dr. O'Neal Rebuttal Report (ECF No. 104-35) at ¶ 14.  A plain reading of the Agreements, account statements, prospectuses and reviewing other record evidence illustrates that no terms like

"conflict of interest" or any similar connotation appear in the Agreements or elsewhere with respect to these alleged conflicts, and the Agreements only state that BNY Mellon will invest in affiliated mutual funds.  Disclosing the investment in affiliated mutual funds is not the same as disclosing a potential conflict of interest created by investing in affiliated mutual funds.  Likewise, according to the Waldens, when they asked why BNY Mellon was investing in affiliated mutual funds, they were not told of the potential conflict of interest at that point.  That BNY Mellon uses the Waldens' knowledge of BNY Mellon investing in affiliated mutual funds as a means of concluding they had knowledge of a conflict of interest does not square.  Again, disclosing BNY Mellon's investments of client assets in affiliated mutual funds does not automatically mean that it met its fiduciary obligation and adequately disclosed an alleged conflict of interest created by investing in affiliated mutual funds, using the Solutions Matrix, setting employee compensation or by having a policy of placing cash assets into CRAs.  Rather, these are facts that a jury could consider to determine whether BNY Mellon disclosed potential conflicts of interest.  Because the Waldens have adduced sufficient evidence that a reasonable jury could conclude BNY Mellon failed to disclose a potential conflict of interest, BNY Mellon's motion for summary judgment is denied in this respect.

BNY Mellon next argues that the Waldens have failed to offer any evidence to support their claim that BNY Mellon received any incentives by investing in affiliated mutual funds.  It argues that its investment in affiliated mutual funds resulted in the Waldens paying lower fees and lower revenue to BNY Mellon. BNY Mellon argues that the record is undisputed that it charged the Waldens fees in accordance with their Agreements, that BNY Mellon made $10,200 less in revenue by investing in affiliated mutual funds rather than unaffiliated funds, that the Waldens paid $50,800 less in fees to BNY Mellon due to its investing in affiliated mutual funds and that

the Waldens' accounts increased in value by $380,655.  BNY Mellon points out that the Waldens' own expert, Dr. O'Neal, admits that BNY Mellon's investment in affiliate funds resulted in lower fees received by BNY Mellon and that it had a financial disincentive to invest in affiliated mutual funds, but invested more heavily in them.  BNY Mellon therefore argues that "BNY Mellon earned less than it could have had it invested in unaffiliated funds, and the Waldens – while being charged precisely what was disclosed to them in the Agreements – paid less in fees by virtue of being invested in" affiliated mutual funds. BNY Mellon Br. (ECF No. 103) at 10.

The Waldens respond that BNY Mellon had inherent conflicts related to affiliated funds and had a duty to disclose the conflicts, even if BNY Mellon earned less from using affiliated funds in some customers' accounts. Waldens' Resp. Br. (ECF No. 152) at 18.  Further, the Waldens point to Dr. O'Neal's analysis that BNY Mellon obtained more fees from keeping cash assets in bank accounts instead of in money market accounts. *Id*. at 18-19.

The extent of the incentives gained from BNY Mellon's investment in affiliated mutual funds is a question of fact and the Waldens have illustrated sufficient evidence that BNY Mellon had financial incentives vis-à-vis its fees to invest client assets in affiliate funds. Dr. O'Neal opined that BNY Mellon "garnered higher all-in fees if the portion of the affiliated fund expense ratio paid to BNY Mellon was higher than the fees that BNY Mellon waived on affiliated investments." Dr. O'Neal Report (ECF No. 104-34) at ¶ 39.  Also, the Waldens maintain that BNY Mellon profited when they picked riskier, affiliated equity funds for the Waldens' IMA accounts because it generated an average fee of 0.83% and as high as 1.62% paid to affiliates, while the waived investment management fees were 0.5%. Waldens' Resp. SMF (ECF No. 153 at p. 49) (citing Dr. O'Neal Report (ECF No. 104-34) at ¶¶ 45-46).  Moreover, the Waldens have adduced sufficient evidence that individual wealth managers were incentivized to place their assets in affiliated

mutual funds through the compensation structure, and that BNY Mellon's placement of client assets into affiliated funds increased revenue and sometimes profits to those funds by virtue of the "economies of scale in investment management." Dr. O'Neal Rebuttal Report (ECF No. 104-35) at ¶ 10.  Moreover, in late-2016, early 2017, when BNY Mellon first included a conflicts of interest disclosure for IRA accounts, it indicated that a portion of the investment advisory fee is credited to BNY Mellon when managed accounts are invested in affiliated funds, the compensation of wealth managers increases as funds assets increase, more assets in affiliated funds can reduce investment research expenses and overhead and expense ratios, so there is an incentive to invest new moneys in affiliated mutual funds to lower the fund's expense ratio for existing investors and improve net investment performance, investing in affiliated mutual funds can provide those funds with "critical mass" so they become and remain viable, disinvesting client holdings from affiliated mutual funds would be disruptive to the management of the affiliated mutual fund and jeopardize its viability to the detriment of BNY Mellon, and that investing in a competitor's affiliated mutual fund could result in reputational damage to BNY Mellon and its affiliates. *Id*. at ¶ 35.  Accordingly, BNY Mellon's motion for summary judgment is denied in this respect.

Next, BNY Mellon argues that Plaintiff's allegation that BNY Mellon's investments in affiliated mutual funds violated a general prohibition in the Agreements on investing in "securities issued by BNY Corp. or its affiliates at all" is a misapprehension of mutual funds, because the affiliated mutual funds are not "issued" by BNY Corp. or its affiliates, and are only colloquially referred to as "affiliated" because BNY Mellon "provides advisory and other services to them" and not because BNY Mellon "issues the funds' securities." BNY Mellon Br. (ECF No. 103) at 11.  BNY Mellon asserts that BNY Mellon's policy prohibits the purchase or retention of publicly traded securities of BNY Corp., unless it is directed to do so by the client, and BNY Mellon never

purchased securities on behalf of the Waldens. *Id*. at 11-12.

While the Waldens included these allegations in their amended complaint, they have not responded to BNY Mellon's argument or point to any facts of record supporting this claim. Specifically, the Waldens alleged BNY Mellon promised in the Agreements not to "use its discretionary authority to purchase securities issued by BNY Corp or its affiliates" and BNY Mellon breached the Agreements because "they did buy affiliated securities." Am. Compl. (ECF No. 40) at ¶ 3. *See also* Am. Compl. (ECF No. 40) at ¶¶ 32(a)-(b); 49(c); 50. The Waldens "cannot rely on unsupported allegations in [their] complaint" to survive a motion for summary judgment and "must present more than the 'mere existence of a scintilla of evidence' in [their] favor." *Shah v. Bank of Am.*, 346 F. App'x 831, 833 (3d Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). Therefore, to the extent that the Waldens claim that BNY Mellon breached the Agreements by investing in securities of BNY Corp. (as opposed to affiliated mutual funds), it is undisputed that BNY Mellon has not invested in securities in violation of the Agreements and BNY Mellon is entitled to summary judgment on this claim.

Next, BNY Mellon argues that the Waldens' claim that BNY Mellon violated a purported duty to create an individualized assessment of client needs fails because the undisputed record evidence shows that BNY Mellon did create an individualized assessment for the Waldens by preparing an Investment Policy Statement ("IPS") to define their financial goals, investment objectives, asset allocation, risk tolerance, tax considerations and time horizon and that the Waldens frequently met with the BNY Mellon team and received individualized materials from BNY Mellon. BNY Mellon Br. (ECF No. 103) at 12. BNY Mellon also argues that the Waldens' expert Dr. O'Neal concedes that he does not dispute that BNY Mellon made individualized assessments when making asset allocation and investment decisions. *Id*. at 13.

Again, while the Waldens included these allegations in their amended complaint, they have not responded to BNY Mellon's argument or point to any facts of record supporting this claim. Specifically, the Waldens alleged BNY Mellon promised in the Agreements to make individualized assessments of client needs and trade client funds based on those individualized assessments and instead used a predetermined program for all its clients that preferred underperforming, conflicted, affiliated funds that charged excess fees and underperformed other, non-conflicted investment options. Am. Compl. (ECF No. 40) at ¶¶ 3; 32(c); 50; 90; 135(c).  As stated, the Waldens "cannot rely on unsupported allegations in [their] complaint" to survive a motion for summary judgment and "must present more than the 'mere existence of a scintilla of evidence' in [their] favor." *Shah*, 346 F. App'x at 833 (quoting *Anderson*, 477 U.S. at 252). Therefore, to the extent that the Waldens claim that BNY Mellon breached the Agreements by failing to make individualized assessments of the Waldens' financial needs, it is undisputed that BNY Mellon has made individualized assessments of the Waldens' financial needs and BNY Mellon is entitled to summary judgment on this claim.

### b.  Conflicts of Interest under Pennsylvania law for Affiliated Mutual Funds

Next, BNY Mellon argues that Pennsylvania law authorizes it to invest in affiliated mutual funds where the fees are disclosed and argues that such investments are not a conflict of interest.

Under 12 C.F.R. § 9.12, "Unless authorized by applicable law, a national bank may not invest funds of a fiduciary account for which a national bank has investment discretion in the stock or obligations of, or in assets acquired from: . . . affiliates of the bank[.]" 12 C.F.R. § 9.12. See 1996 OCC Ltr. LEXIS 33, at *2 (Mar. 12, 1996); 1989 OCC Ltr. LEXIS 86, at *2 (Sept. 21, 1989) (Office of the Comptroller of the Currency has interpreted 12 C.F.R. § 9.12 as applying to investments in affiliated mutual funds).  The phrase "applicable law" means "the law of a state or

other jurisdiction governing a national bank's fiduciary relationships" and "the terms of the instrument governing a fiduciary relationship." 12 C.F.R. § 9.2(b).

BNY Mellon argues that Pennsylvania law, specifically 20 Pa.C.S. §§ 7209, 7211, 7772(c)(4) and (5), and 7772(h), permits corporate trustees to invest in proprietary or affiliated mutual funds so long as the fees or compensation is disclosed to the trust beneficiary.  Despite BNY Mellon's argument that Pennsylvania law explicitly allows it to invest in affiliate or proprietary funds so long as the fees are disclosed, the statutes that permit this conduct apply only to situations involving trustees and guardians and are found in Title 20 applying to Decedents, Estates and Fiduciaries. *See* Editors' Notes, 20 Pa. Stat. and Consol. Stat. Ann. 7201 ("Section 7201 applies the prudent investor rule to **trustees** and **guardians**.") (emphasis added); *Applicability of statutory provisions as to trustee's conflict of interest*, 35 Standard Pennsylvania Practice 2d § 161:78 ("The statutory conflict of interest provisions **apply to any trust** created under a governing instrument executed on or after March 21, 1999, unless the governing instrument expressly provides that the provisions do not apply.") (emphasis added); 20 Pa.C.S. § 102 (defining "fiduciary" as including "personal representatives, guardians, and trustees, whether domiciliary or ancillary, individual or corporate, subject to the jurisdiction of the orphans' court division.").  BNY Mellon has cited to no case law, and this Court has not independently found any, which apply 20 Pa.C.S. §§ 7209, 7211, 7772(c)(4) and (5), and 7772(h) to investment advisors who are not operating under a trust. Nor has BNY Mellon cited to any provision set forth in the Agreements which incorporate these statutes.  The cases cited by BNY Mellon for this proposition include *Estate of Firstin*, 2008 Phila. Ct. Com. Pl. LEXIS 324 (Pa. Com. Pl. Sept. 6, 2008), which involved an orphan's court challenge under Pennsylvania trust law to a corporate trustee's investment of trust assets in affiliated mutual funds. It did not involve investments in affiliated

mutual funds by an investment advisor under a fiduciary obligation. Similarly, *Banks v. N. Tr. Corp.*, No. CV 16-9141-JFW (JCX), 2020 WL 1062144, at *2 (C.D. Cal. Mar. 5, 2020), and *In re JPMorgan Chase Bank, N.A.*, 122 A.D.3d 1274, 1277, 996 N.Y.S.2d 816 (2014) challenged investment of trust assets into affiliated/proprietary mutual funds under California and New York law, respectively, and did not involve the investments at issue here.

Even assuming that 20 Pa.C.S. §§ 7209, 7211, 7772(c)(4) and (5), and 7772(h) apply in this case, these provisions do not foreclose a breach of contract claim for a corporate's fiduciary failure to disclose conflicts of interest related to investments in affiliated mutual funds. 20 Pa.C.S. § 7209 provides that a bank acting as a fiduciary may invest in affiliated funds if it is not prohibited by the governing instruments and compensation or fees are disclosed. Similarly, 20 Pa.C.S. § 7211 provides that a corporate fiduciary may invest in affiliated funds so long as it is not prohibited in the governing instrument and is otherwise in conformity with the laws of Pennsylvania and the United States. 20 Pa.C.S. §§ 7772(c)(4) and (5) includes a list of conflicts of interest related to the "sale, purchase, exchange, encumbrance or other disposition of property" and provides that such actions are "presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with . . . an agent of the trustee unless the trustee is a corporation and the agent is an affiliate of the corporation or the transaction is authorized by [20 Pa.C.S. §] 7209 (relating to mutual funds)" or with "a corporation or other person or enterprise in which the trustee or a person that owns a significant interest in the trustee has an interest that might affect the trustee's judgment, but this paragraph does not apply to an affiliate of a corporate trustee or to a transaction authorized by [20 Pa.C.S. §] 7209." 20 Pa.C.S. § 7772(c)(4) and (5). Lastly, 20 Pa.C.S. § 7772(h) provides that a transaction authorized by section 7209, i.e., transactions related to affiliated mutual funds, is not precluded "if fair to the beneficiaries." 20 Pa.C.S. § 7772(h)(6).

The advisory comments to section 7772 related to conflicts of interest provide "transactions involving trust property entered into with persons who have close business or personal ties with the trustee" are "presumptively voidable" unless "the trustee establishes that the transaction was not affected by a conflict between personal and fiduciary interests." Editors' Notes, 20 Pa. Stat. and Consol. Stat. Ann. § 7772 (West).  Importantly here, the Editors' Notes state that "**[e]ven where the presumption** under subsection (c) **does not apply, a transaction may still be voided** by a beneficiary **if the beneficiary proves that a conflict between personal and fiduciary interests existed and the transaction was affected by the conflict**." *Id.* (emphasis added). Therefore, these statutes do not attempt to inventory and codify every conceivable conflict of interest that may arise, and also do not conclude that investments in affiliated mutual funds are never a conflict of interest if the instrument permits them and the fees are disclosed.  Rather, they set the standard for what types of transactions are deemed void without further inquiry due to inherent conflicts of interest[4], or whether the transactions are presumptively voidable, unless the presumption is rebutted by showing the transaction was fair.[5]  In other words, these statutes simply indicate that it is not a *presumed* conflict of interest for BNY Mellon to invest in affiliate funds where the Agreements permitted such an investment and the fees charged to the Waldens were disclosed. It does not mean that the Waldens do not have a cause of action as a matter of law for BNY Mellon's alleged failure to disclose the several conflicts of interest the Waldens allege regarding the investment in affiliated mutual funds.

Accordingly, BNY Mellon has not shown it is entitled to judgment as a matter of law and its motion in this respect is denied.

---

[4]      Transactions set forth in 20 Pa.C.S. § 7772(b).

[5]      Transactions set forth in 20 Pa.C.S. § 7772(c).

### c.  Waldens' Damages

Next, BNY Mellon argues that the Waldens have not suffered an ascertainable loss as required for their breach of contract and UTPCPL claims.  BNY Mellon argues that as to the Waldens' breach of contract claim, "[t]o the extent that Plaintiffs base their claims of loss of fees charged to them, Plaintiffs' expert admits the fees were accurately disclosed and charged, and Stephen Walden testified that he has 'no complaint about fees.' " BNY Mellon Br. (ECF No. 103) at 21.  BNY Mellon further argues that as to the Waldens' UTPCPL claims, "the statutory damages Plaintiffs seek under the UTPCPL are special damages" which are prohibited by the Agreements. *Id*.

The Waldens respond that they are "seeking to recoup the fees they paid to [BNY Mellon] with the expectation of being served by a faithful fiduciary, which they were deprived of due to [BNY Mellon's] breach of fiduciary duty." Waldens' Resp. Br. (ECF No. 152) at 21. The Waldens claim that they are owed "professional fees" under both their breach of contract and UPTCPL claims and assert that their expert opined that the total amount of fees paid by the Waldens to BNY Mellon amounted to $138,845. *Id*. at 21-22.

In their reply, BNY Mellon argues that the Waldens are seeking disgorgement of fees, and such damages are inappropriate where a plaintiff received a benefit and no causal relationship exists between the alleged breach and the proposed disgorgement. BNY Mellon Reply Br. (ECF No. 148) at 5.

At a recent oral argument on the pending motion for class certification, the Waldens confirmed that they are seeking a disgorgement of all fees paid by BNY Mellon as their sole theory of recoverable damages. Tr. (ECF No. 172) at 16:2-12 ("our damages model simply adds up the fees and compensation paid to BNY by each customer and calls for the return of that amount of

money to the customers.").

The parties have not fully developed whether the Waldens are entitled to disgorgement of fees under either a breach of contract or UTPCPL claim, and it would be premature for the Court to decide as a matter of law whether the Waldens are entitled to these damages. Accordingly, the Court will hold this portion of the motion for summary judgment in abeyance pending the parties' supplemental briefing on the issue, as outlined in the corresponding Order.

As for BNY Mellon's argument that the Waldens are not entitled to "special damages" for their UTPCPL claims because they are barred by the Agreements, they provide no legal authority for the proposition that an investment agreement that contains a provision barring "special damages" prevents a plaintiff from obtaining statutory damages under the UPTCPL. The singular case cited by BNY Mellon simply concluded that statutory penalties under the Pennsylvania Wage Payments and Collections Law were special damages that needed to be pleaded with specificity under the Pennsylvania Rules of Civil Procedure. *Morin v. Brassington*, 871 A.2d 844, 849 (Pa. Super. 2005). Accordingly, BNY Mellon's motion for summary judgment is denied in this respect.

### d. Justifiable Reliance on Agreements under the UTPCPL

The basis for the Waldens' breach of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") claims is that the Waldens relied on BNY's promise to be a fiduciary but the Agreements themselves were deceptive as to the fiduciary services provided.

BNY Mellon argues that because the Waldens testified they did not read or recall reading the Agreements, they could not have justifiably relied on them to their detriment under the UTPCPL.

The UTPCPL is Pennsylvania's consumer protection law that protects the public from unfair or deceptive business practices. 73 P.S. § 201-3. The Waldens bring their UTPCPL claims

under its "catch-all" provision which prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).  A plaintiff must show justifiable reliance on the alleged deceptive conduct to maintain a claim under the catch-all provision of the UTPCPL. *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 201–02 (Pa. 2007); *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 221 (3d Cir. 2008).  Justifiable reliance requires that the plaintiff illustrate that he engaged in some detrimental activity because of the deceptive conduct. *Danganan v. Guardian Prot. Servs.*, 813 F. App'x 769, 773 (3d Cir. 2020) (unpublished) (quoting *Hunt*, 538 F.3d at 222, n.4) (additional citations omitted).  It is not enough for the plaintiff to show a "causal connection between the misrepresentation and the harm." *Hunt*, 538 F.3d at 222.  A narrow exception to showing justifiable reliance exists: where the parties are bound by a fiduciary relationship, it is enough to establish justifiable reliance under the UTPCPL as a matter of law. *See Hunt*, 538 F.3d at 222, n. 17 (noting that the Pennsylvania Superior Court recognized a "allows a presumption of reliance where the defendant and plaintiffs are in a fiduciary relationship."); *Debbs v. Chrysler Corp.*, 810 A. 2d 137, 157 (Pa. Super. 2002) ("This Court has excused proof of individual detrimental reliance where the defendant has a fiduciary relationship with the plaintiff[ ]."); *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) ("The only exception to proving justifiable reliance is when the parties have entered into a fiduciary relationship."); *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, No. 4:10-CV-800, 2011 WL 13160292, at *3 (M.D. Pa. Jan. 10, 2011) (the existence of a fiduciary relationship is enough to establish justifiable reliance as a matter of law).

It is undisputed that the Waldens and BNY Mellon entered into the Agreements which provided BNY Mellon was to act as the Waldens fiduciary with respect to the discretionary investment management powers set out in the Agreements.  Because the Waldens' UTPCPL

claims stem from BNY Mellon's fiduciary duty, there is a presumption of justifiable reliance as a matter of law.[6]  Therefore, the Waldens are entitled to a presumption of reliance for their UTPCPL claims as a matter of law. Accordingly, BNY Mellon's motion for summary judgment is denied in this respect.

### e.  Statute of Limitations

Next, BNY Mellon argues that the statute of limitations for the Waldens' claims for breach of contract and UTPCPL violations are four years and six years respectively, and because the Waldens signed their Agreements with BNY Mellon on April 9, 2014 and did not file this lawsuit until December 21, 2020, their claims are time-barred.

A federal court sitting in diversity must apply the state substantive law that governs the

---

[6]     Despite BNY Mellon's arguments that the Waldens are not entitled to a presumption of reliance because their relationship with BNY Mellon was "purely contractual," or because their testimony could be construed as admitting they did not read the Agreements, BNY Mellon Reply Br. (ECF No. 148) at 5-6; BNY Mellon Br. (ECF No. 103) at 21-22, these arguments are without merit. BNY Mellon was obligated to act as a fiduciary, regardless of whether the Waldens read the Agreements or whether that obligation arose from contract.  Moreover, all the cases cited by BNY Mellon for this proposition are not applicable in that they did not involve a fiduciary relationship or were not addressing the topic of justifiable reliance under the UTPCPL, or both. *Mallory v. Wells Fargo Bank, N.A.*, No. 3:19-CV-0744, 2023 WL 5443493, at *10 (M.D. Pa. June 21, 2023), report and recommendation adopted as modified, No. 3:19-CV-744, 2023 WL 5435614 (M.D. Pa. Aug. 23, 2023) (determining UTPCPL claims were barred by the gist of the action doctrine); *Univ. of Puerto Rico Ret. Sys. v. Lannett Co.*, No. 21-3150, 2023 WL 2985120, at *2 (3d Cir. Apr. 18, 2023) (determining a "fraud-on-the-market" theory of securities fraud action); *Cohen v. Chicago Title Ins. Co.*, No. CIV.A. 06-873, 2013 WL 842706, at *5 (E.D. Pa. Mar. 7, 2013) (denying plaintiff's motion for summary judgment on UTPCPL claims finding that justifiable reliance is an issue for the jury to determine); *Coleman v. Commonwealth Land Title Ins. Co.*, 318 F.R.D. 275, 285 (E.D. Pa. 2016) (finding no common law or statutory fiduciary relationship existed between title agents and consumers for UTPCPL purposes); *Christopher v. First Mut. Corp.*, No. CIV.A. 05-0115, 2008 WL 1815300, at *11 (E.D. Pa. Apr. 22, 2008) (finding no justifiable reliance for plaintiff's UTPCPL claims; no allegations of fiduciary relationship); *Laidley v. Johnson*, No. CIV.A. 09-395, 2011 WL 2784807, at *3 (E.D. Pa. July 11, 2011) (finding no justifiable reliance for plaintiff's UTPCPL claims; no allegations of fiduciary relationship); *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) (finding no justifiable reliance for plaintiff's UTPCPL claims; no allegations of fiduciary relationship).

action. *Orson, Inc. v. Miramax Film Corp*., 79 F.3d 1358, 1373 n. 15 (3d Cir. 1996) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In this diversity case, Pennsylvania law applies. In Pennsylvania, the statute of limitations for breach of contract is four years, 42 Pa.C.S. § 5525(a)(8), and for claims under the UTPCPL is six years, 42 Pa.C.S. § 5527(b); *Morse v. Fisher Asset Mgt., LLC*, 206 A.3d 521, 526 (Pa. Super. 2019). "The issue of when a cause of action accrues for [s]tatute of [l]imitations purposes is a matter of substantive law of the state concerned which must be applied by a federal court in a diversity action." *Britt v. Arvanitis*, 590 F.2d 57, 59 (3d Cir. 1978) (citations omitted).

Generally, in a breach of contract action, the cause of action accrues under Pennsylvania law when the breach occurs, or when the right to initiate and maintain a suit arises. *Packer Soc. Hill Travel Agency, Inc. v. Presbyterian U. of Pennsylvania Med. Ctr.*, 635 A.2d 649, 652 (Pa. Super. 1993). There is, however, the "discovery rule" exception which tolls the limitations period "until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Coleman v. Wyeth Pharm., Inc.*, 6 A.3d 502, 510 (Pa.Super. 2010) (citation omitted), appeal denied, 611 Pa. 638, 24 A.3d 361 (2011). "The discovery rule in Pennsylvania applies to all causes of action, including breach of contract." *Morgan v. Petroleum Products Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. 2014) (citation omitted). "The purpose of the discovery rule has been to exclude from the running of the statute of limitation that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury." *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005). Because the question of whether a party is "reasonably unaware" is "a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its

cause, ordinarily, a jury is to decide it." *Fine*, 870 A.2d at 858 (citations omitted).  A court may make this determination as a matter of law when "reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause." *Id.* at 858–59.

BNY Mellon argues that the Agreements contained extensive authorizations and disclosures that it would typically invest in affiliated mutual funds, the fees associated with the investments, and its right to receive additional payments from affiliated mutual funds for services rendered, and therefore the cause of action for Plaintiffs' claims accrued when they signed the Agreements.  BNY Mellon further argues that the investments in affiliated mutual funds are outlined in the Waldens' June and August 2014 Statements, which also contain an affiliated mutual fund disclosure, and on two occasions, in August 2015 and December 2016, the Waldens expressed their dissatisfaction regarding the performance of Dreyfus and Mellon funds to BNY Mellon associates. BNY Mellon Br. (ECF No. 103) at 24-25.  In response, while not explicitly citing the discovery rule, the Waldens argue that the Agreements and account statements included no information that would put them on notice of their claims because no conflict was explicitly disclosed in those documents, including, for example, BNY Mellon's use of the confidential "Solutions Matrix" or the incentives for BNY Mellon employees to favor affiliated funds. Waldens' Resp. Br. (ECF No. 152) at 23-24.

Whether the Waldens knew or should have known through exercising reasonable diligence of their injury and its cause is a question of fact for the jury to decide.  Viewing the facts in the light most favorable to the Waldens, neither the Agreements nor the Statements explicitly disclose the potential conflict of interest for investing in affiliated mutual funds or placing their cash assets in a CRA instead of a money market fund, and a jury could reasonably determine the Waldens did

not know their cause of action accrued at the time they executed their Agreements or received Account Statements shortly thereafter. Whether the Waldens expressing their dissatisfaction with BNY Mellon's investments in affiliated mutual funds imputes the requisite knowledge element for the discovery rule to apply is evidence for the jury to consider in making that determination. Accordingly, BNY Mellon's motion for summary judgment is denied in this respect.

### f. Agreements' "Notification of Disagreements" Provision

Lastly, BNY Mellon argues that the Waldens failed to comply with the Agreements' "Notification of Disagreements" provision which provides that "any disagreement with respect to the Account statements . . . must be made known to [BNY Mellon] within 90 days after the statement . . . is received; otherwise [the Waldens] will be deemed to have approved the statement and the reported transactions." BNY Mellon SMF (ECF No. 102) at ¶ 46. BNY Mellon argues that because the Waldens did not challenge its investment in affiliated mutual funds within 90 days of the statement being received, they have waived their claims. BNY Mellon's argument is without merit. According to the Waldens, they were not explicitly notified of any alleged conflict, and therefore cannot be expected to notify BNY Mellon of a disagreement based on information that is not explicitly set forth in their account statements, i.e., the use of the Solutions Matrix, financial incentives related to affiliated mutual funds or the placement of their assets in bank accounts instead of money market funds. Accordingly, BNY Mellon's motion for summary judgment is denied in this respect.

## V.    CONCLUSION

Based on the above, BNY Mellon's motion for summary judgment (ECF No. 98) is granted in part, deferred in part, and denied in part. Specifically, BNY Mellon's motion is granted as to the Waldens' breach of contract claim that BNY Mellon breached the Agreements by investing in securities of BNY Corp. and granted as to the Waldens' breach of contract claim that BNY Mellon

breached the Agreements by failing to make individualized assessments of the Waldens' financial

needs.  The Court will defer ruling on BNY Mellon's motion in part on the issue of whether the

Waldens are entitled to disgorgement of fees for supplemental briefing to be submitted consistent

with the following Order.  BNY Mellon's motion for summary judgment is denied in all other

respects.

      An appropriate Order follows.


                                           BY THE COURT:

                                         s/Cynthia Reed Eddy
                                         United States Magistrate Judge


cc:      Counsel of record via CM/ECF electronic filing